MUNICIPALITY OF ANCHORAGE and
Lexington Insurance Company,
Appellants,

v.

BAUGH CONSTRUCTION & ENGI-
NEERING COMPANY, Appellee.

BAUGH CONSTRUCTION &
ENGINEERING COMPANY,
Appellant,

v.

MUNICIPALITY OF ANCHORAGE and
Lexington Insurance Company,
Appellees.

Nos. S–699, S–831.

Supreme Court of Alaska.

July 18, 1986.

Wm. Lothian Sells, Jr., of counsel, John W. Coyne, Asst. Municipal Atty., Jerry Wertzbaugher, Municipal Atty., Anchorage, for appellant Municipality of Anchorage.

Craig H. Bennion, Foulds, Felker & McHugh, Seattle, Wash., and Wm. Lothian Sells, Jr., Skellenger, Ginsberg & Bender, Anchorage, for appellant Lexington Ins. Co.

Kenneth R. Atkinson, Atkinson, Conway & Gagnon, Anchorage, for appellee Baugh Const. and Engineering Co.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

*Introduction.*

This case is on appeal from a jury verdict denying liability in a suit for damages by the Municipality of Anchorage ("the municipality") against Baugh Construction & Engineering Company ("Baugh"). The primary issue in this appeal concerns whether the superior court erred in joining the municipality's insurer as a party plaintiff. We conclude that the insurer should not have been joined. We hold, however, that the municipality has not made a sufficient showing of prejudice from the erroneous joinder to warrant overturning the verdict.

*Facts.*

On April 27, 1978, the municipality and Baugh entered into a contract that required Baugh to design, construct and equip a facility to shred solid waste prior to landfill disposal. The contract also called for Baugh to prepare the facility for operation, to test the facility, to train municipal personnel to operate the facility, and to warrant the design and performance of the facility.

The contract provided for an "acceptance testing phase" to last at least 30 days, under actual working conditions. This phase was to continue until conditional or final acceptance by the municipality, whichever came first. The contract also stated that until conditional or final acceptance Baugh had "complete control of, and responsibility for, the operation of the facility." The contract provided that during the acceptance testing phase the municipality would provide and pay for all necessary personnel to operate the facility, except for a supervisor to be provided by Baugh, but that until acceptance all municipal personnel employed in the operation of the facility would be "supervised and directed entirely by [Baugh]."

The contract also required Baugh to maintain a variety of insurance for the project, including builder's risk insurance, and provided that if Baugh failed to maintain any of the required insurance, the mu-

nicipality could procure such insurance and hold Baugh responsible for the premiums the municipality paid. Pursuant to the contract Baugh obtained builder's risk insurance with the Allianz Insurance Company in April, 1978. The named insured were the municipality, Baugh and their subcontractors. The policy was extended several times by Baugh, with the last extension carrying an expiration date of February 6, 1980.

Construction commenced at the plant and the acceptance testing phase began in December, 1979. Apparently the "shredder mills" were working adequately, but the "ferrous recovery system," which was supposed to recover metals from the solid waste, was not performing well enough to meet the performance criteria for acceptance set out in the contract.

During this period relations were strained between the municipality and Baugh. On January 21, 1980 Baugh apparently removed its personnel from the plant, which the municipality interpreted as an attempt to transfer control of and responsibility for the facility to the municipality. The municipality resisted these actions, stating that it had not conditionally or finally accepted the facility. After negotiations, Baugh returned to the plant and testing continued. On March 24, 1980, there was an explosion and fire at the plant which caused considerable damage. On April 29, 1980, the municipality terminated the facility contract.

The municipality had obtained a $10 million insurance policy from the Lexington Insurance Company ("Lexington") on January 1, 1980, insuring all of the municipality's real and/or personal property against all risks of direct physical loss or damage, including buildings, contents, fixtures, equipment, and machinery. The Lexington policy also covered buildings or structures in the course of construction. This was a "contingency" insurance policy, providing that it did not cover loss or damage already covered by other insurance, except to the extent that the other insurance did not cover the loss. The named insured on the policy was described as the municipality and "all undeclared entities authorized by the Municipal Assembly, as their interests may appear."

On February 1, 1980, Baugh had sent a letter to the municipality advising it that the builder's risk insurance policy was scheduled to expire on February 6 and stating that it was assuming the municipality would assume coverage as of February 7. There is no evidence in the record as to whether the municipality responded to this letter before February 7. The builder's risk policy expired on February 6. After the explosion occurred on March 24, 1980, the municipality informed Baugh that it did not consider Baugh covered under the Lexington "contingency" policy. On January 8, 1981, the municipality submitted a proof of loss statement for the explosion to Lexington, claiming $639,475.55 under the policy.

On September 9, 1980, the municipality filed a complaint for damages against Baugh. The complaint, as subsequently amended, contained 14 counts. The only count that was tried and that is at issue here alleged that under the waste disposal facility contract Baugh bore the risk of loss for the explosion and fire because the municipality had never accepted the facility.[1]

In its answer, Baugh asserted a variety of affirmative defenses including excuse of performance, conditional acceptance, comparative negligence, unclean hands, waiver, and coverage under the Lexington policy.

---

**1.** Several of the other counts which asserted claims relating to the design and construction of the facility were apparently bifurcated and tried in another case. The remaining counts alleged strict product liability and warranty claims related to the explosion and fire and named as an additional defendant the Heil Company ("Heil"), the manufacturer of the equipment involved in the explosion. After Baugh filed a third-party complaint against Heil seeking indemnification, a settlement was announced between Heil, The Ideal Insurance Company, the municipality and Lexington on May 22, 1984. Heil loaned the municipality and Lexington $287,500 and in return the municipality dismissed the remaining counts with prejudice and agreed to pay Heil and Ideal the first $287,500 from any recovery against Baugh.

Baugh also asserted several counterclaims against the municipality.[2]

Shortly after the final amended complaint was filed, the municipality and Lexington entered into a "Loan Receipt and Agreement" ("LRA"). Under the LRA Lexington "loaned" the municipality $583,-115.56, representing funds for damage and loss caused by the explosion and fire at the shredder facility. This did not equal the entire amount of damages claimed. The "loan" was to be repaid only in the event and to the extent that the municipality made any recovery in its suit against Baugh for damages from the explosion and fire. The agreement provided that Lexington would appoint, at its cost and expense, attorneys to prosecute the fire and explosion litigation up to the "loan" amount, and that these attorneys would have complete control of that litigation. The agreement also provided that Lexington would bear 82% of the costs of that litigation. Finally, Lexington ratified the municipality's filing suit in its behalf and consented "to the Municipality's representation of both Lexington's and Municipality's claims and interests ... in the sole name of the Municipality ... as plaintiff."

Subsequently, Baugh moved under Alaska Civil Rule 19(a) to join Lexington as a party plaintiff on all claims relating to fire and explosion damages claims for relief. The municipality opposed the motion and submitted an Affidavit of Ratification from Lexington, stating that it agreed to be bound by the outcome of the municipality's suit. The superior court ordered Lexington joined as a party plaintiff.

At trial the superior court ruled that the language of the facility contract initially placed the risk of loss from explosion on Baugh for damage to the facility. The superior court also ruled that as a matter of law conditional acceptance did not occur under the language of the contract, as the performance criteria for the ferrous recovery system had not been met prior to the time of the explosion. The superior court therefore dismissed Baugh's second affirmative defense, which asserted that Baugh had no responsibility for operating the facility because conditional acceptance had occurred prior to the explosion. The trial court stated that it was making a "limited ruling" that dealt only with Baugh's second affirmative defense.

The jury was instructed on virtually all of Baugh's affirmative defenses, and after deliberating for 3½ hours returned a verdict of no liability. The jury found for Baugh through special interrogatories on all of its affirmative defenses. The municipality now appeals. Baugh crossappeals from the superior court's award of costs and attorney's fees.

## I. DID THE SUPERIOR COURT ERR IN JOINING LEXINGTON AS A PARTY PLAINTIFF?

Upon Baugh's motion, the superior court ordered that Lexington be joined as a party plaintiff under Alaska Civil Rule 19(a). The municipality contends that Lexington should not have been joined either under Rule 19(a), or as a real party in interest under Rule 17(a).

### A. Civil Rule 19(a).

Rule 19(a) provides in part:

A person ... shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

2. Shortly after the municipality submitted its statement of proof of loss, Lexington filed a complaint for declaratory judgment in U.S. District Court against the municipality and Baugh, seeking a declaration that it did not owe any obligation of payment under its policy. On February 27, 1981, Lexington dismissed the action before answer.

■ It appears clear that complete relief could have been afforded to all parties absent Lexington's presence as a party. The municipality could have sued for the entire amount if Lexington were not a party. Baugh argues that Lexington was a necessary party in order for it to litigate its assertion that it was an "implied insured" under the Lexington policy. However the evidence Baugh used to support this assertion, such as the insurance policy, correspondence between the parties and any testimony from Lexington's representatives,[3] could have been admitted without Lexington's presence as a named party.

Lexington's joinder was also not necessary to avoid multiple litigation or liability. Lexington by virtue of its ratification expressly agreed to be bound by the outcome of the litigation and therefore could not relitigate any claim brought by the municipality. There also appears to be no danger that Lexington's absence would impede its own interests since the LRA provided that Lexington would recover from any judgment up to the amount of its payment.

■ We therefore conclude that it was improper to join Lexington under Rule 19(a) since none of the prerequisites are met. As a general proposition a partially subrogated insurer who is clearly bound by the result of the lawsuit should not be joined under Rule 19(a). *See, e.g., Glacier General Assurance Company v. G. Gordon Symons Co.,* 631 F.2d 131, 134–35 (9th Cir.1980); *Roy v. Star Chopper Co.,* 584 F.2d 1124, 1134 (1st Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979); *Hancotte v. Sears Roebuck & Co.,* 93 F.R.D. 845, 847 (E.D.Pa.1982).

### B. *Civil Rule 17(a).*

Alaska Civil Rule 17(a) provides in part: Every action shall be prosecuted in the name of the real party in interest.... No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

In *Truckweld Equipment Co. v. Swenson Trucking,* 649 P.2d 234, 239 (Alaska 1982), we held that the superior court had properly denied defendant's Rule 17(a) motion to join plaintiff's partially subrogated insurer because the motion was untimely. We also stated, however, that had the motion been timely the insurer should have been joined under Rule 17(a). *Id.*

Our decision was based on the notion that "[t]he pleadings should be made to reveal and assert the actual interest of the plaintiff, and to indicate the interests of any others in the claim." 649 P.2d at 238 (citation omitted). While there was no risk of multiple litigation in the case, we pointed out that Rule 17(a) also reflected a policy against use or sham plaintiffs. *Id.* Since the insured did not have to sue for the amount for which it had already been reimbursed and since the insurer's claim was being directly litigated, there was no reason that the insurer should not be made a named party. We concluded:

[T]he broad costs and attorney's fees provisions in Alaska make it particularly desirable that all of the concerned parties in a lawsuit make a formal appearance. Where a party's claim is directly litigated before the courts of this state, we believe that that party should bear the burdens as well as the benefits of the litigation.

*Id.*

The municipality argues that this case is distinguishable from *Truckweld* and that joinder was inappropriate under Rule 17(a) because Lexington paid it through an LRA and because Lexington formally ratified the municipality's action against Baugh.

### 1. *Loan Receipt Agreement.*

The municipality argues that pursuant to the LRA, Lexington's advance was a loan,

---

**3.** The record on appeal is unclear whether there was any such testimony.

not a payment under the insurance policy, and therefore Lexington was not a real party in interest under Rule 17(a). The municipality argues that many courts have accepted LRA's as legitimate business arrangements and as a valid way to avoid subrogation, without examining the parties' "true motives." *See, e.g., Luckenbach v. W.J. McCahan Sugar Refining Co.,* 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918); *Peoples Loan & Finance Corporation v. Lawson,* 271 F.2d 529 (5th Cir.1959); *Northern Insurance Company of New York v. Conn Organ Corporation,* 40 Or. App. 785, 596 P.2d 605 (1979).

■ We decline to accept Lexington's argument that under the LRA it made a "loan," without further inquiry into the true nature of the payment Lexington made to the municipality. To do so would be to ignore Rule 17(a)'s language and the policy behind it, expressed in *Truckweld,* that a party whose claim is being directly litigated should be before the court. Many courts do not automatically accept LRA's where the agreements do not bear indicia of a true loan, as opposed to payment under the policy, and where there is no reason for the use of such agreements other than to avoid subrogation by frustrating the enforcement of Rule 17(a). *See Executive Jet Aviation, Inc. v. U.S.,* 507 F.2d 508, 512–13 (6th Cir.1974); *City Stores Co. v. Lerner Shops of District of Columbia,* 410 F.2d 1010, 1013 (D.C.Cir.1969).

The municipality did not have to pay back the "loan" unless it recovered damages from Baugh. The LRA also provided that Lexington would appoint and pay for attorneys to prosecute Baugh's claims up to the loan amount. The LRA further provided that the attorneys appointed by Lexington would have complete control of the litigation. Lexington offers no reason for the use of the LRA beyond avoidance of subrogation and joinder under Civil Rule 17(a).

■ We think that the conditions of the LRA put Lexington in a situation identical to that of a partially subrogated insurer who had made payment to the insured un-

der the policy. Lexington certainly had enough stake in the litigation to be considered a "real party in interest." To deny this because the payment is termed a "loan" would be to place form over substance and defeat the purposes behind Rule 17(a).

### 2. Ratification.

■ The municipality argues that Lexington's joinder was not required under Rule 17(a) because Lexington had formally ratified the municipality's bringing the action. We agree.

The language of Rule 17(a) treats ratification as an authorized alternative to joinder, stating that after an objection that the action is not being prosecuted in the name of the real party in interest, a reasonable time should be allowed "for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." We have indicated this in prior decisions. In *Truckweld* we stated:

> It follows from our discussion of joinder ... that where recovery is sought for the claim of a partially subrogated insurer, the insurer is obligated to make a formal appearance of some kind.... [R]atification is the functional equivalent of joinder as far as the assessment of attorney's fees and costs is concerned.

649 P.2d at 239; *see KOS v. Williams,* 616 P.2d 868, 870 (Alaska 1980) (Rule 17(a) contemplates two orders, the second of which "may dismiss the action after the reasonable time passes without joinder or ratification").

■ Ratification by a partially subrogated insurer will generally satisfy the policy concerns behind Rule 17(a) that we expressed in *Truckweld.* Since ratification bound Lexington to the outcome of the suit there is no danger of multiple lawsuits. Ratification also ensures that the interested party makes a formal appearance before the court. The ratifying party is subject to any orders the court may make concerning discovery or attorney's fees. Similarly, ratification assures that all interested parties bear the burdens of claims litigated on their behalf, since Lexington was expressly

bound to any assessment of costs or attorney's fees against the municipality.[4] We further note that Lexington's absence as a named party in this case does not mean that the action would be prosecuted by a sham plaintiff. The municipality was a real party in interest as the amount of its claim had not been paid in full by Lexington.[5]

■ We therefore conclude that, absent unusual circumstances, a partially subrogated insurer should have the option of ratifying an action brought by its insured. *E.g., Hancotte,* 93 F.R.D. at 846; *James v. Nashville Bridge Co.,* 74 F.R.D. 595, 597 (N.D.Miss.1977); *State ex rel. Nawd's T.V. and Appliance, Inc. v. District Court,* 168 Mont. 456, 543 P.2d 1336, 1338 (1975).

■ Baugh argues that even if Lexington should have been allowed to ratify, its joinder was not error because the decision whether to join or ratify is one which is in the trial court's discretion. We disagree. The trial court has the ultimate discretion to assure that the ratification will have the same effect as joinder in protecting against subsequent litigation, but it does not have the discretion to generally disregard the choice of the real party in interest. *See Nashville Bridge,* 74 F.R.D. at 597; *Southern National Bank of Houston, Texas v. Tri Financial Corporation,* 317 F.Supp. 1173, 1188 (D.C.Tex.1970); *Nawd's T.V.,* 543 P.2d at 1339.

We therefore conclude that the superior court erred in ordering Lexington joined as a party plaintiff.

## II. DOES THE SUPERIOR COURT'S ERRONEOUS JOINDER OF LEXINGTON WARRANT VACATING THE JURY VERDICT FOR BAUGH?

The municipality argues that Lexington's joinder resulted in jury prejudice against Lexington and the municipality, and therefore the verdict in favor of Baugh must be vacated. It argues that evidence of the insurance coverage, and the jury's knowledge from the introduction of the LRA that Lexington had already paid the municipality a large portion of the claim undoubtedly prejudiced the jury. As evidence of this prejudice the municipality points to the brevity of the jury's deliberations. Although the trial lasted over three weeks, the jury, which was given the case on a Friday afternoon, returned a verdict of no liability after 3½ hours of deliberation. The verdict also reflected the jury's findings in Baugh's favor, through special interrogatories, on every one of his affirmative defenses. The municipality argues that the only explanation for this is that the jurors ignored evidence before them, did not engage in full and fair deliberation and instead took the simplest "escape route" to avoid deliberating over a weekend.

■ As a general rule haste by the jury in arriving at a verdict has no effect upon the validity of the verdict. This rule recognizes that the jury may have decided issues during the trial and respects the historical independence of juries. We have stated that we are not impressed with abstract claims that an insurer's presence prejudiced the jury since insurance is a "fact of life." *Truckweld,* 649 P.2d at 238 n. 4. The municipality has not alleged that Baugh engaged in any potentially prejudicial questioning or argumentation before the jury regarding insurance.

We note further that evidence of the municipality's insurance coverage would have come before the jury whether or not

---

**4.** Baugh argues that ratificaton is not the functional equivalent of joinder here because Lexington did not agree not to "hide behind" the municipality's exemption from execution against its property under AS 09.38.015(c) and because Lexington did not explicitly agree to submit to discovery. Baugh has not made any showing how Lexington could hide behind an exemption for municipal property, nor how ratification rather than joinder could thwart its

discovery efforts in view of the power of the court to subject a ratifying party to the rules of discovery.

**5.** We do not address the question whether ratification would be a satisfactory alternative to joinder or substitution in the case of a fully subrogated insurer.

Lexington had been joined as a party plaintiff, because of the affirmative defenses Baugh asserted. Baugh maintained that it was insured under the Lexington policy and that the municipality had waived its right to contend that the risk of loss remained with Baugh. The municipality, in effect, implied that Baugh could rely on the Lexington policy by failing to object when Baugh let the builder's risk insurance lapse. By virtue of these affirmative defenses, the admissible evidence would have included the Lexington policy, Lexington's complaint for declaratory judgment in federal court seeking a declaration of rights vis-a-vis Baugh and the municipality, and correspondence between the municipality and Baugh referring to insurance.

■ Thus, we conclude that while the superior court erred in joining Lexington as a party plaintiff, the municipality has not shown sufficient prejudice to warrant vacating the jury's verdict in favor of Baugh.

### III. AFFIRMATIVE DEFENSES.

The municipality argues that the trial court erred in giving Baugh's affirmative defenses to the jury.

■ The jury found that the municipality waived its right to contend that Baugh had the risk of loss for the fire and explosion damages. Waiver is generally defined "as the intentional relinquishment of a known right." *Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978) (citations omitted). The jury was instructed in accordance with this definition. A waiver need not be express, but can be implied "where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party." *Id.*

■ The jury's factual findings, if supported by the evidence presented at trial, will not be disturbed where there is room for diversity of opinion among reasonable people. *Alaska Bussell Electric Co. v.*

*Vern Hickel Construction Co.*, 688 P.2d 576, 581 (Alaska 1984), *citing Levar v. Elkins*, 604 P.2d 602 (Alaska 1980).

■ In our view there was sufficient evidence for the jury to have found waiver. The facility contract provided that if Baugh did not provide certain insurance, the municipality could procure such insurance and hold Baugh responsible for the premiums paid by the municipality. On February 1, 1980 Baugh sent a letter to the municipality advising it that Baugh's builders risk insurance policy was due to expire on February 6. The letter stated further:

> [I]t appears that the most important aspect of all of this is that the insurance coverage on the building not lapse. Based on this we are assuming that the municipality will assume coverage as of 12:01 a.m. February 7th. In the event that this does not meet with your concurrence, please contact the undersigned ... by phone.

The municipality apparently did not respond or object to the letter before February 7. From this evidence a reasonable juror could infer that the municipality waived the right to contend that Baugh, rather than the insurance company, bore the risk of loss.[6]

In fact the municipality does not argue that there was insufficient evidence of waiver. It contends that the superior court should have stricken Baugh's waiver defense, because the court had previously ruled in striking Baugh's affirmative defense that the municipality had conditionally accepted under the contract, that "conditional acceptance did not occur as a matter of law." The municipality asserts that "[t]he effect of this ruling was to establish, as a matter of law, that under the [contract] the risk of loss remained with Baugh and that the municipality had not waived that assertion."

■ The superior court stated, in turn, that its conclusion that conditional acceptance had not occurred under the lan-

---

**6.** Since the jury's finding on this affirmative defense can support its verdict of no liability we need not address the municipality's arguments concerning Baugh's other affirmative defenses.

guage of the contract was a "limited ruling" dealing only with Baugh's specific defense that conditional acceptance had occurred under the contract. Such a ruling does not preclude a defense that even though the municipality had a right to contend that Baugh bore the risk of loss under the contract, it waived that right through conduct indicating that an insurance company would bear the risk.[7]

7. Two additional specifications of error require discussion. The municipality contends that the superior court erred in submitting the defense of contract modification to the jury. In two separate instructions the trial court addressed this subject. In its first instruction the court stated in part:

> ... you must determine whether, after February 1, 1980, the municipality and Baugh modified the Facility Contract requirement that Baugh be responsible for the risk of loss by explosion or fire by determining whether the municipality agreed to assume that risk or agreed to substitute its own insurance coverage for that risk, or is estopped to assert that after February 6, 1980, the risk of loss lay with Baugh.

The superior court further elaborated on the contract modification issue in the following manner:

> ... one of the issues in this lawsuit is whether the Facility Contract was modified after February 1, 1980, to put the risk of loss on the municipality. It is for you, the jury, to determine whether the contract between the municipality and Baugh was modified by the express words of the parties or by their conduct during performance of the contract. You must determine this under the instructions of the court and from the evidence presented during trial.

In our view, the superior court did not err in submitting the issue of contract modification to the jury. The municipality claims erro.' here because the defense of contract modification was "neither pled nor responded to" and thus instructing the jury on the subject "could only have enhanced the jury's obvious confusion." Baugh counters in part by arguing that "even though not expressly pled, the issue of contract modification was made known to plaintiffs before trial, was dealt with during trial, and is so intertwined with waiver and estoppel as a means of causing modification, that ... [the municipality] knowledgeably tried the issue."

Our review of the record convinces us that the issue of contract modification was tried by the implied consent of the municipality. In the context of this record and the provisions of Civil Rule 15(b) we conclude that the municipality's specification of error must be rejected. Civil Rule 15(b) is controlling here. It provides in part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence or to raise these issues may be made upon the motion of a party at any time, even after judgment; but the failure to amend does not affect the result of the trial of these issues.

One issue remains; just prior to the commencement of trial the municipality moved to strike the jury demand as to the affirmative defense of equitable estoppel and as to other equitable defenses. See Alaska R.Civ.P. 39(a). Baugh, citing *Shope v. Sims*, 658 P.2d 1336, 1340 (Alaska 1983); *Alaska Northern Development, Inc. v. Alyeska Pipeline Service Co.*, 666 P.2d 33, 40, 41 (Alaska 1983); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2338, at 134–135 (1971), argued that Alaska had adopted the rule of *Beacon Theaters v. Westover*, 359 U.S. 500, 508, 79 S.Ct. 948, 955, 3 L.Ed.2d 988, 996 (1959) under which facts common to legal and equitable claims must first be tried to a jury and the primary equitable issues, if any, disposed of in light of the jury verdict. The superior court followed Baugh's suggested procedure and "proceeded with a jury trial using a general verdict with eleven jury interrogatories." After the jury verdict, the municipality requested the superior court to rule on equitable issues since the court was the sole and exclusive trier of fact for these equitable issues. The court subsequently denied the municipality's motion for findings on all of the equitable issues.

In denying the motion the superior court ruled that although the right to jury trial does not extend to actions which are solely equitable in nature, the right to a jury trial is lost only in the most imperative circumstances. The superior court ruled that where both legal and equitable issues are presented in a single case and that where issues raised by an equitable counterclaim are so related to issues triable of right by a jury that they are "intertwined," a trial by jury should be afforded on all issues. *Citing Cheek v. McGowan Electric Supply Co.*, 404 So.2d 834 (Fla.App.1981). Applying the foregoing principles the superior court concluded that:

> Plaintiff's claim is solely legal; Baugh's defenses are both legal and equitable; Baugh has sought no affirmative relief against plaintiffs; all of Baugh's efforts at trial were made for strictly defensive purposes; the jury was instructed as to the elements of the equitable as well as the legal defenses and found in Baugh's favor on all questions submitted to it. Under these circumstances, the jury properly decided all of the issues....
>
> ....

We hold that the superior court's ruling should be sustained. As noted in *Shope* and

## IV. ATTORNEY'S FEES AND COSTS.

■ Both the municipality and Baugh contest the attorney's fees and costs award which the superior court made to Baugh. An attorney's fees award will be set aside on appeal only if it is manifestly unreasonable and amounts to a clear abuse of discretion. *Alaska Northern Development, Inc. v. Alyeska Pipeline Service Co.*, 666 P.2d 33, 42 (Alaska 1983).

■ The municipality argues the attorney's fees award was excessive because Baugh also defended against the municipality's design and construction deficiencies claim which was bifurcated from this case. However, the superior court made an allocation of 60% of Baugh's attorney's pre-trial efforts to the explosion case. The municipality does not explain why this allocation is improper except to say that the damages it was asking from the deficiencies claim were more than twice the amount of the damages asked for in the explosion case. This does not necessarily bear on how much time was necessary to prepare the defense of each case. Absent any further showing we cannot conclude the superior court's allocation was manifestly unreasonable.

■ The municipality also argues that Baugh should not be considered the prevailing party for the product liability counts that were dismissed with prejudice because of the municipality's settlement with Heil. The general rule, however, is that since dismissal with prejudice is an adjudication on the merits, a "prevailing party" determination is possible for purposes of Alaska Civil Rule 82. *Bovee v. LaSage*, 664 P.2d 160, 164 n. 10 (Alaska 1983). The municipality argues that Baugh had nothing to do with this dismissal but the fact remains that the counts were dismissed with prejudice against Baugh, and

therefore it was not an abuse of discretion for the superior court to consider Baugh a "prevailing party."

■ The municipality also argues that it "prevailed" on two of Baugh's affirmative defenses. It does not explain how or in what degree this should require a reduction in attorney's fees. Baugh is clearly the "prevailing party" here as the verdict was unequivocally in Baugh's favor. *E.g., Adoption of V.M.C.*, 528 P.2d 788, 795 (Alaska 1974).

■ In its cross appeal as to the superior court's award of costs and attorney's fees, Baugh makes several arguments. It argues first that the superior court clerk should have attributed the same 60% of deposition costs to the explosion case that the superior court did for attorney's fees. The clerk stated that he had no way of knowing what percentage to allocate to the explosion case and accepted the municipality's percentages. These percentages varied from deposition to deposition, including attributions of over 60% to the explosion case in some instances. The superior court in approving the clerk's order could have changed the allocation, but did not do so. The allocation of costs, however, seems based on the content of the depositions, while the allocation of fees depends on the time spent by the attorneys. We do not think it was a clear abuse of discretion for the superior court not to have used the same allocation.

■ Baugh also argues that the clerk gave no explanation for allowing $1,000 as costs for 17,056 photocopies. Baugh states that this was unreasonable and that 15¢ per copy should be assessed with a 60% allocation to the explosion case. Baugh does not explain why 15¢ is the proper figure. While the amount assessed may be

*Alaska Northern Development,* we have adopted the rule of *Beacon Theaters.* Application of *Beacon Theaters* leads us to the conclusion that there existed facts common to the legal claims (the municipality's claims, Baugh's defenses of

contract modification and waiver) and to the equitable claims (Baugh's affirmative defenses of equitable estoppel and declaratory judgment) which required that the facts common to such legal and equitable claims be tried to the jury.

below the "going rate," we do not think it is necessarily "manifestly unreasonable."

Baugh also argues that the superior court erred in its assessment of attorney's fees. Baugh's attorney calculated attorney's fees at billing rates of $200/hr. in superior court and $175/hr. out of trial. In awarding attorney's fees to Baugh the trial judge stated: "I have not awarded attorneys' fees, even in cases of this type, by calculating reasonable actual fees at a rate of more than $125 per hour. Baugh's fees are approximately 40 percent higher than that figure, and I have adjusted for this quality surcharge." In making this adjustment the superior court multiplied the billings by 60%.

Baugh argues that .60 is an incorrect multiplier to use to bring the rates down to $125/hour because it does not follow from the fact that a number is 40% greater than another number that the other number is 60% less. Baugh is correct that multiplying his billing rates by .60 reduces them to less than $125/hr. ($120/hr. in superior court; $105/hr. at pre-trial), the rate the superior court seemed to approve. Baugh argues that this court should change the multipliers to .714 for pre-trial work and to .625 for superior court work.

Baugh did, however, bring this matter to the superior court's attention in a motion to reconsider attorney's fees and in an accompanying letter. The court denied the motion. Given the superior court's awareness of Baugh's argument, we do not think it was manifestly unreasonable to reduce the rates to $105 and $120 per hour.[8]

We conclude that the superior court did not abuse its discretion in its award of attorney's fees and costs to Baugh.

AFFIRMED.

---

**8.** Baugh also argues that it should have been reimbursed for the amount it had to pay its surety in attorney's fees to defend against the municipality's claims for failure to complete performance after the explosion. However, the municipality correctly points out that the surety was a party only to the bifurcated construction deficiencies case and therefore reimbursement was properly denied here.