**SAVAGE ARMS, INC., Petitioner,**

**v.**

**WESTERN AUTO SUPPLY CO., Respondent.**

**Nos. 8612, 8721, 8611.**

Supreme Court of Alaska.

March 2, 2001.

Rehearing Denied April 4, 2001.

---

Theodore M. Pease, Jr., and Michael W. Sewright, Burr, Pease & Kurtz, Anchorage, for Petitioner.

James M. Powell and Kimberlee A. Colbo, Hughes, Thorsness, Powell, Huddleston & Bauman, LLC, Anchorage, for Respondent.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Can a corporation that purchases assets of the manufacturer of a rifle sold in Alaska be held liable for personal injury caused in Alaska by a defect in the rifle? The superior court held that it could, and we agree. But we reverse and remand for application of the pertinent successor liability doctrines discussed below. We also hold that the indemnity claim brought by the rifle's distributor against the successor corporation must be prosecuted by the insurers which fully discharged the distributor's personal injury liability.

## II. FACTS AND PROCEEDINGS

The relevant facts are few. Jack Taylor's minor son suffered personal injuries when a defective .22 caliber rifle discharged during target shooting near Nikiski. Savage Industries, Inc. manufactured the rifle, and Western Auto Supply Company, which claimed to have acquired the rifle from the manufacturer, sold it to a retail store in Maine; the rifle was eventually resold to Jack Taylor in Alaska. Taylor sued Savage Industries in 1990 for his son's injuries; in an amended complaint, he also sought recovery from Western Auto.

Western Auto filed a third-party complaint in its name seeking indemnity from Savage

Arms, Inc., which had purchased assets from Savage Industries in 1989. Western Auto settled with the Taylors in May 1995, and its insurers paid the entire settlement amount.

At issue here are three superior court orders. The first held that Alaska law governs the issue of successor liability. The second granted Western Auto summary judgment against Savage Arms, holding Savage Arms liable as "the legal successor to Savage Industries, Inc." The third denied Savage Arms' motion to substitute Western Auto's insurers for Western Auto as the real parties in interest, but required the insurers to ratify the litigation.

The superior court denied Savage Arms' motions for reconsideration. We granted Savage Arms' petitions for review and ordered full briefing. We review the three orders under AS 22.05.010 and Alaska Rule of Appellate Procedure 402.

## III. *DISCUSSION*

### A. *Standard of Review*

■ The appropriate choice of law is a legal question to which we apply our independent judgment.[1] The scope of successor liability in Alaska is a legal question of first impression, which we answer by adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[2] In applying rules of successor liability to this case, we will affirm Western Auto's summary judgment only if the record presents no genuine issues of material fact and Western

Auto is entitled to judgment as a matter of law.[3]

■ Although we generally review rulings on joinder and ratification for abuse of discretion,[4] we review de novo the underlying legal questions,[5] such as whether a party is a real party in interest under Alaska Civil Rule 17(a).

### B. *Choice of Law*

Savage Arms challenges the superior court's ruling that Alaska law governs the issue of successor liability. It argues that Texas law should apply because all transactions relevant to its purchase of Savage Industries' assets occurred in Texas. In Savage Arms' view, the case before the court deals with the transaction between Savage Arms and Savage Industries, and the underlying tort does not bear on the choice of law question.[6]

Western Auto defends the superior court's decision, contending that Alaska law should apply because the underlying injury occurred in Alaska. Western Auto also reasons that successor liability is but an extension of products liability law, which is itself a tort doctrine.

Texas statutory and case law seems to disfavor both traditional and modern doctrines of successor liability,[7] but neither this court nor the Alaska state legislature has resolved the successor liability questions presented in this case.

1. See *Langdon v. Champion*, 752 P.2d 999, 1001 (Alaska 1988).

2. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

3. See *Newton v. Magill*, 872 P.2d 1213, 1215 (Alaska 1994).

4. See *Fairbanks N. Star Borough v. Kandik Constr., Inc. & Assoc.*, 795 P.2d 793, 802–03 (Alaska 1990), *vacated in part on other grounds*, 823 P.2d 632 (Alaska 1991).

5. See *Langdon*, 752 P.2d at 1001.

6. Savage Arms invokes our opinion in *Armstrong v. Armstrong*, 441 P.2d 699 (Alaska 1968), in which we held that Alaska law governs the ques-

tion of interspousal tort immunity, even though the auto accident that inspired the tort suit occurred in Canada. *See id.* at 700–01. There, we treated the interspousal immunity question independently of the underlying tort question, and focused on the spousal relationship between the parties to the lawsuit. *See id.* But to apply the *Armstrong* approach here only begs the question of whether successor liability should be treated as wholly independent. *Armstrong* does not control.

7. *See* Tex. Bus. Corp. Act Ann. art. 5.10(B)(2) (Vernon 1997); *Mudgett v. Paxson Mach. Co.*, 709 S.W.2d 755, 758–59 (Tex.App.1986); *see also McKee v. American Transfer & Storage*, 946 F.Supp. 485, 487 (N.D.Tex.1996). *But see Western Resources Life Ins. Co. v. Gerhardt*, 553 S.W.2d 783, 786 (Tex.Civ.App.1977) (noting exceptions for merger, consolidation, and fraud).

We look to the Restatement (Second) of Conflict of Laws for guidance in resolving choice-of-law issues.[8] The Second Restatement requires a separate choice-of-law analysis for each issue presented.[9] We likewise follow this rule of dépeçage,[10] and determine the proper choice of law on the issue of successor liability without regard to other issues in the case.

Before we can address which state's law should apply to this issue, we must first determine whether successor liability is better characterized in terms of contract or tort.[11] In one sense, successor liability derives from corporate and contract law, because it may require the interpretation of the contracts that governed the transfer of assets between corporations. But successor liability is also a creature of tort law when it is claimed that the successor is liable because a product defect has caused injury or death.

Other jurisdictions are split as to whether successor liability should be evaluated using the choice-of-law rules governing tort or corporate and contract law. The Fifth Circuit, for example, has held that the law of the state with the most significant corporate contacts should apply to successor liability questions.[12] The Seventh Circuit held similarly in *Ruiz v. Blentech Corp.*[13] But several federal district courts have explicitly applied the law of the state with the most significant torts contacts,[14] and state courts have split on the question.[15]

■ We decline to follow the Fifth and Seventh Circuits, because we believe that when a defective product causes personal injury, successor liability is most appropriately characterized as a torts question. Successor liability is essentially an expansion of products liability law, which derives from tort principles of negligence and strict liability, and rejects contract-derived requirements such as privity. The purpose of the modern strict liability regime "is to insure that the cost of injuries resulting from defective products [is] borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves."[16] Treating a successor liability question solely as one of contract law would allow "the party who benefitted from

8. *See, e.g., Palmer G. Lewis Co. v. ARCO Chemical Co.,* 904 P.2d 1221, 1227 (Alaska 1995) ("When choice of law issues arise, we commonly refer to the *Restatement (Second) of Conflicts* for guidance.").

9. *See* Restatement (Second) of Conflict of Laws § 145 cmt. d (1971) ("The courts have long recognized that they are not bound to decide all issues under the local law of a single state."); *Ruiz v. Blentech Corp.,* 89 F.3d 320, 324 (7th Cir.1996) (holding that under the Second Restatement test, "[a] court therefore conducts a separate choice-of-law analysis for each issue in a case, attempting to determine which state has the most significant contacts with that issue.").

10. *See* Black's Law Dictionary 448 (7th ed.1997) (defining dépeçage as "[a] court's application of different state laws to different issues in a legal dispute; choice of law on an issue-by-issue basis"); *see also* Bryan A. Garner, A Dictionary of Modern Legal Usage 2666 (2d ed.1995).

11. *See, e.g., Ruiz,* 89 F.3d at 326 ("[T]he courts of several states have struggled to decide whether [successor liability law] is a part of corporate law or tort law.").

12. *See Webb v. Rodgers Mach. Mfg. Co.,* 750 F.2d 368, 374 (5th Cir.1985).

13. 89 F.3d 320, 326 (7th Cir.1996).

14. *See, e.g., Ede v. Mueller Pump Co.,* 652 F.Supp. 656, 658 n. 1 (D.Colo.1987), *disagreed with on different grounds, Florom v. Elliott Mfg.,* 867 F.2d 570, 579–80 (10th Cir.1989); *Reed v. Armstrong Cork Co.,* 577 F.Supp. 246, 248 (E.D.Ark.1983); *Korzetz v. Amsted Indus.,* 472 F.Supp. 136, 141–42 (E.D.Mich.1979), *declined to follow on other grounds, Johnson v. Ventra Group, Inc.,* 191 F.3d 732, 746 (6th Cir.1999).

15. *See, e.g., In re Asbestos Litigation (Bell),* 517 A.2d 697, 699 (Del.Super.1986) (holding that corporate law should apply because key question was legal effect of contracts between corporations); *American Nonwovens, Inc. v. Non Wovens Eng'g, S.R.L.,* 648 So.2d 565, 570 (Ala.1994) (holding that conflict rule for tort cases should apply to corporate successor liability issue). *See also* David W. Pollak, *Successor Liability in Asset Acquisitions,* 1126 PLI/Corp 85, 107–12 (1999) (discussing different jurisdictions' approaches to choice-of-law issues for successor liability claims).

16. *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871, 878 (Alaska 1979) (quoting *Clary v. Fifth Ave. Chrysler Ctr., Inc.,* 454 P.2d 244, 248 (Alaska 1969)); *see also Greenman v. Yuba Power Prods., Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 900–01 (1963).

the bargain [to] escape liability even though the party who transferred the benefit would have been liable had not the contract been consummated." [17] Such a result would undermine the principles that govern our products liability law. And although Savage Arms argues that the public policy behind products liability law is of "little interest" here because Western Auto purchased liability insurance that fully protected it, Western Auto's suit does not pursue a commercial cause of action. Because Western Auto's insurers settled the personal injury suit, Western Auto now stands in the tort plaintiff's shoes.

Thus, in context of a claim that a defective product has caused personal injury, we think successor liability is more aptly treated as a matter of tort law.

■ Having determined that successor liability in a products liability context is best characterized as part of the law of tort, we must now decide which state's laws should apply to the case at hand. The Second Restatement states that "with respect to an issue in tort," courts should look to the local law of the state with the "most significant relationship" to the parties and the occurrence. [18] We conclude that Alaska has the most significant torts contacts with this legal issue. We look in particular to the underlying tort action that gave rise to this litigation. Jack Taylor and his son were both Alaska residents when the accident occurred. Taylor purchased the rifle in Alaska, and the rifle was being used here, where its defect injured his son. The defect that injured Taylor's son potentially endangered any person within a lethal vicinity while the rifle was being used in Alaska. Finally, Jack Taylor litigated his suit against Western Auto in Alaska's state courts. Because the relationship between the tort litigants is centered in Alaska, Alaska law should govern.

We therefore conclude that the superior court did not err by concluding that Alaska law applies to the issue of successor tort liability.

### C. Successor Liability

Savage Arms challenges Western Auto's summary judgment on the issue of successor liability. It argues that it should not be held liable even if Alaska law applies. This argument raises issues of first impression in Alaska.

■ Generally, when one company sells all its assets to another, the acquiring corporation is not liable for the debts and liabilities of the selling company. [19] Courts have traditionally recognized four exceptions to this rule of non-liability, where (1) the purchaser expressly or implicitly agrees to assume liability, (2) the asset purchase amounts to a consolidation or merger, (3) the purchasing corporation is a "mere continuation" of the selling corporation, or (4) the transfer amounts to little more than a "sham" transaction to avoid liabilities. [20] More recently, some courts have recognized three additional "modern" exceptions to the rule of non-liability: the "continuity of enterprise," "product line," and "duty-to-warn" exceptions. [21]

Western Auto argues that we should adopt any one of three different successor liability doctrines in this case: the traditional "mere continuation" exception and the modern "continuity of enterprise" and "product line" exceptions. We first identify which exceptions are available under Alaska law, and then remand for the factual analysis necessary to ascertain whether successor liability is proper in this case under any of the approved

---

**17.** *Korzetz*, 472 F.Supp. at 141.

**18.** *See* Restatement (Second) of Conflict of Laws § 145(1). To determine the place of most significant relationship, we look to:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

*Id.* § 145(2). We evaluate these factors and contacts in light of their "relative importance" to the particular issues in each case. *Id.*

**19.** *See* Pollak, *supra* note 15, at 99; *see also* Richard A. Epstein, *Torts* 400–02 (1999).

**20.** *See* Pollak, *supra* note 15, at 100–03.

**21.** *See id.* at 103–08.

exceptions. The superior court did not specify which exception justified its imposition of successor liability against Savage Arms.

### 1. The traditional "mere continuation" exception

■ Courts have traditionally imposed liability on successor corporations where the successor corporation is "merely a continuation" of the selling corporation.[22] The primary elements of the "mere continuation" exception include use by the buyer of the seller's name, location, and employees, and a common identity of stockholders and directors.[23] This well-established exception stems from judicial refusal to honor a transaction which is "little more than a shuffling of corporate forms, lacking any fundamental change with independent significance."[24]

■ The "mere continuation" exception is available to claimants seeking to impose liability on a successor corporation for products manufactured by a predecessor. Although Savage Arms argues that we should not adopt this exception, we disagree, because this is a well-recognized exception, and we see no reason to reject its application here. We therefore hold that it is available under Alaska law.

### 2. The modern "continuity of enterprise" exception

Western Auto also asks us to adopt the modern "continuity of enterprise" and "prod-

uct line" exceptions. We conclude that the facts in this case are ill-suited to the "product line" exception, and we therefore decline to consider it at this time.[25] We do, however, adopt the "continuity of enterprise" exception, for the reasons explained below.

■ The "continuity of enterprise" exception is an outgrowth of the traditional "mere continuation" theory of liability.[26] Under this exception, a successor corporation may be held liable for injuries caused by its predecessor's products where the totality of the transaction between the successor and the predecessor demonstrates a basic continuity of the predecessor enterprise.[27] The successor may be held liable even though the sale of assets is for cash and there is no continuity of shareholders.[28]

■ Thus, whereas the traditional "mere continuation" exception depends on the existence of identical shareholders, the "continuity of enterprise" looks beyond that formal requirement and considers the substance of the underlying transaction.[29] The key factors under the "continuity of enterprise" exception, first articulated in *Turner v. Bituminous Casualty Co.*,[30] are: (1) continuity of key personnel, assets, and business operations; (2) speedy dissolution of the predecessor corporation; (3) assumption by the successor of those predecessor liabilities and obligations necessary for continuation of normal business operations; and (4) continuation

**22.** *See id.* at 101.

**23.** *See id.; see also* Phillip I. Blumberg, *The Continuity of the Enterprise Doctrine: Corporate Successorship in United States Law*, 10 Fla. J. Int'l L. 365, 371 (1996) ("The doctrine ... is applicable only where the successor has the same stockholders as the predecessor and conducts the same business with the same management, facilities, employees, products, and trade names.").

**24.** Blumberg, *supra* note 23, at 371.

**25.** Under the "product line" exception, a successor will be liable if it acquires substantially all of the predecessor's assets and undertakes essentially the same manufacturing operation of the same or similar products. *See Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3, 8–11 (1977); 63 Am.Jur.2d *Products Liability* § 133 (1997); Pollak, *supra* note 15, at 104–16. Be-

cause the facts in this case seem ill-suited to this exception, we decline to evaluate the wisdom of adopting the "product line" theory at this time. Our decision today does not preclude further consideration of this exception in an appropriate case.

**26.** *See* Richard L. Cupp, Jr., *Redesigning Successor Liability*, 1999 U. Ill. L.Rev. 845, 848 & n. 16 (1999).

**27.** *See* 63 Am.Jur.2d *Products Liability* § 129.

**28.** *See Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 244 N.W.2d 873, 883–84 (1976); Cupp, *supra* note 26, at 848–49.

**29.** *See* 63 Am.Jur.2d *Products Liability* § 130.

**30.** 397 Mich. 406, 244 N.W.2d 873 (1976).

of corporate identity.[31] This is a limited exception that looks past the identity of shareholders and directors, and focuses on whether the business itself has been transferred as an ongoing concern.

Only a minority of courts have thus far adopted the "continuity of enterprise" exception.[32] And the American Law Institute recently declined to adopt both this exception and the "product line" exception for the Restatement (Third) of Torts.[33] The Third Restatement's commentary indicates that the vast majority of courts considering these modern exceptions have rejected them.[34] Although there is some dispute about exactly how many jurisdictions have decided the issue,[35] it is clear that a majority of jurisdictions have not adopted the "continuity of enterprise" exception.

Critics of the modern exceptions (such as "continuity of enterprise") argue primarily that expanding liability harms the overall economy by making it more difficult for companies to reorganize or sell their assets without destroying the value of the ongoing business enterprise.[36] For example, they assert that a buyer interested in purchasing substantially all of the assets of a corporation will, in some cases, decline to make the purchase if it will be forced to assume liability for past product defects as well. As a result, some corporations will be unable to find purchasers, and will instead· be forced to sell off the corporate assets on a piecemeal basis, squandering any accumulated goodwill.[37] Such a piecemeal sale would give a corporation certain economic advantages: the seller's shareholders would be able to receive full value for the remaining assets, and successor liability would not flow to the purchasers under any of the traditional or modern theories.[38] But a piecemeal sale would cause an ongoing business to be lost to society, and potential claimants would be no better off.

This argument, although compelling in theory, seems to paint an incomplete picture of the economic realities. If successor liability is expanded to include the "continuity of enterprise" exception, some companies indeed might be unable to find buyers for their ongoing businesses. But we have not been referred to any evidence that adopting this modern "continuity of enterprise" exception (or the marginally more popular "product line" exception) has in fact increased the number of corporate liquidations or piecemeal breakups, or that rejecting the modern exceptions has in fact decreased liquidations or piecemeal sales.[39] And our research has not disclosed studies that have so concluded.

We also note that permitting successor liability under the "continuity of enterprise"

---

31. *See id.* at 883–84; *see also* Pollak, *supra* note 15, at 103; 63 Am.Jur.2d *Products Liability* § 132.

32. *See* Restatement (Third) of Torts: Products Liability § 12, Reporters' Note at 215–19 (1998).

33. *See id.* § 12 cmt. b at 210 & Reporters' Note at 215–19.

34. *See id.* § 12, Reporters' Note at 217–18. The Restatement identifies only three states where courts have adopted the "continuity of enterprise" exception: Alabama, Michigan, and New Hampshire. *See id.* at 219.

35. The Third Restatement lists twenty-two states in which state courts (or federal courts applying state law) have rejected both the "continuity of enterprise" and "product line" exceptions. *See id.* § 12, Reporters' Note at 217–18. But one commentator estimates that only eighteen jurisdictions as of mid–1998 had actually rejected the modern exceptions, when considering those states whose highest courts had yet to rule on the issue. *See* Cupp, *supra* note 26, at 852–54. Professor Cupp states that courts interpreting the law of Mississippi, Ohio, and South Carolina have also recognized and adopted the "continuity of enterprise" exception. *See* Cupp, *supra* note 26, at 854 n. 44.

36. *See* Restatement (Third) of Torts: Products Liability § 12 cmt. b, at 211; Epstein, *supra* note 19, at 400–01; Michael D. Green, *Fairness and Successor Liability: The Limits of the Common Law Process*, 8 Kan. J.L. & Pub. Pol'y 119, 121 (1998).

37. *See* Epstein, *supra* note 19, at 401; Restatement (Third) of Torts: Products Liability § 12 cmt. b, at 211.

38. *See* Epstein, *supra* note 19, at 401–02; Restatement (Third) of Torts: Products Liability § 12 cmt. b, at 211.

39. *See, e.g.,* Restatement (Third) of Torts: Products Liability § 12 cmt. b at 211 & Reporters' Note at 215–21; Epstein, *supra* note 19, at 400–02; Green, *supra* note 36, at 121.

exception will not discourage large-scale transfers so long as anticipated successor liabilities do not exceed the value of the corporation's accumulated goodwill. Presumably, many corporations will continue to engage in efficient and productive transfers, with the purchasing firm merely factoring into the purchase price the cost of those successor liabilities.[40] When firms contract for an asset transfer where the basic enterprise is to be continued, they negotiate to a price that reflects the fair market value of the transfer, taking heed of the risk of future claims.[41] The purchasing firm will value any potential successor liability claims at least at the incremental cost of obtaining insurance coverage against successor liability for them.[42] Where that insurance is too expensive or is unavailable, negotiations could collapse, and the firm will either continue to exist (and be subject to liability claims) or liquidate (and future victims will receive no recovery). But in many cases, we would expect selling and purchasing firms simply to negotiate to a rational price that takes account of these potential claims. The posited negative effects on the overall economy are too indeterminate and speculative to outweigh the policy of compensating persons injured by product defects.[43]

The same reasoning applies to the Restatement authors' concerns regarding potential "windfalls."[44] In many cases, a predecessor manufacturing company will be purchased by a larger, more financially-sound corporation. The rule we adopt here does not limit injured plaintiffs' recovery to the value of the assets purchased by the successor corporation, so there could conceivably be situations in which product defect victims would receive a larger recovery than they conceivably could have received had the predecessor company remained an ongoing concern, and been bankrupted by the total claims. The Restatement authors view the added recovery potential as an "injustice" to the successor corporation.[45] But we think the Restatement analysis defeats the assumptions behind tort law. We assume that meritorious claims will be paid; that they are sometimes not paid due to insolvency does not change that underlying assumption. To characterize as a "windfall" full recovery for losses caused by product defects unjustly challenges the legitimacy of the injuries suffered. And once again, purchasing corporations can attempt to account for this risk of loss in the purchase price.

The other objections to expanded successor liability rules are also not dispositive. Successor liability potentially conflicts with maximizing the value received for bankrupt estates.[46] But we see no persuasive reason to favor corporate creditors over claimants later injured by the seller corporation's products.[47] Also, some courts have argued that the modern exceptions impose liability on entities having no causal relationship with the harm.[48] But basic to the "continuity of enterprise" exception is the preservation of a substantial portion of the goodwill of the predecessor corporation; the successor is fundamentally the same enterprise as the predecessor. When a firm negotiates to purchase another corporation, keeping the

---

40. *See* Cupp, *supra* note 26, at 861–77.

41. *See* Michael D. Green, *Successor Liability: the Superiority of Statutory Reform to Protect Product Liability Claimants*, 72 Cornell L.Rev. 17, 40 (1986).

42. *See id.* at 40; Cupp, *supra* note 26, at 862 n. 90.

43. *See* Epstein, *supra* note 19, at 402 (explaining that corporations are learning to navigate modern successor liability rules).

44. *See* Restatement (Third) of Torts: Products Liability § 12 cmt. b., at 210–11.

45. *Id.* at 210.

46. *See* Michelle M. Morgan, *The Denial of Future Tort Claims in In Re Piper Aircraft: Will the Court's Quick–Fix Solution Keep the Debtor Flying High or Bring it Crashing Down?*, 27 Loy. U. Chi. L.J. 27, 36–37 (1995).

47. Nonetheless, federal bankruptcy law may govern whether potential claims for injuries not yet incurred may be discharged in a bankruptcy proceeding. In this case, the First Circuit has ruled that there is no discharge of Western Auto's claims. *See infra* note 56.

48. *See, e.g., Polius v. Clark Equip. Co.*, 802 F.2d 75, 82–83 (3d Cir.1986); *Johnston v. Amsted Indus., Inc.*, 830 P.2d 1141, 1144 (Colo.App.1992); *see also* Restatement (Third) of Torts: Products Liability § 12 cmt. b, at 210.

"enterprise" intact, it must anticipate any potential successor liabilities and negotiate an appropriate price. To permit the successor, which presumably negotiated a discount for potential successor liabilities when dickering over the purchase price, to avoid liability based on lack of causation would give the successor an unwarranted windfall.

Finally, this new rule will also have the effect of encouraging existing corporations to produce safer products, in keeping with the public policy goals that underlie product liability law generally.[49] Corporations are currently motivated to correct defects to reduce their own exposure to liability, but the traditional successor liability regime undermines that incentive by giving the manufacturing corporation another option: offering itself for sale to a new investor. Without successor liability, the original shareholders can receive full compensation for the current value of the firm, without sharing the burden caused by any defective products manufactured before the sale. The rule we announce today will give manufacturing corporations additional incentives to market non-defective products, in order to maximize the corporations' market value in event of sale.[50]

Some commentators,[51] including the Restatement authors,[52] reason that legislatures are better situated than courts to define the parameters of successor liability. But we think this is an appropriate subject for judicial decision because it is directly related to products liability law, a doctrinal road long traveled by courts.[53] For example, the four traditional exceptions were created by the courts.[54] There is also some suggestion that

legislation in other states has failed to address these problems.[55] We see no reason to await legislation before addressing this issue.

We therefore adopt the "continuity of enterprise" exception to the general rule of nonliability for corporate successors.

### 3. *Propriety of the summary judgment order*

 Although we here approve the "mere continuation" and "continuity of enterprise" exceptions, it is nonetheless necessary to reverse Western Auto's summary judgment order for two reasons. First, material factual disputes remain unresolved. Many key facts are uncontested, but certain important facts (such as the percentage of stock former shareholders in Savage Industries own in Savage Arms) are not established by the record. Second, the uncertainty regarding the proper legal standard governing successor liability appears to have prevented the parties from developing the record to address the applicable legal tests. We consequently remand for consideration of the "mere continuation" and "continuity of enterprise" exceptions in the context of this case.

We also note that Savage Arms is not shielded from liability by the fact that it purchased Savage Industries' assets through a bankruptcy proceeding. The First Circuit ruled in a related aspect of this case[56] that Western Auto and Taylor were not "afforded appropriate notice of the material terms of the all-asset transfer, nor of the chapter 11 plan" and therefore that the parties to the transfer, Savage Industries and Savage

---

49. *See* Cupp, *supra* note 26, at 860–63 (arguing that greater successor liability will channel responsibility back to original product manufacturer).

50. *See id.* This incentive holds true until the firm knows that its liabilities will outstrip any goodwill available to be sold. But companies in that position would not be relevant to this successor liability issue, because no buyer would pay for an ongoing concern valued at less than its assets.

51. *See, e.g.,* Green, *supra* note 41.

52. *See* Restatement (Third) of Torts: Products Liability § 12, Reporters' Note at 216–17.

53. *See* Cupp, *supra* note 26, at 877–78.

54. *See* Cupp, *supra* note 26, at 878.

55. *See* Cupp, *supra* note 26, at 879–83.

56. In April 1992 Western Auto filed a third-party complaint against Savage Arms for indemnification or apportionment of damages. Savage Arms contended that Western Auto's claims were barred by the terms of Savage Industries' bankruptcy. The First Circuit Court of Appeals ultimately resolved the issue in Western Auto's favor in December 1994. *See Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.),* 43 F.3d 714, 723 (1st Cir.1994).

Arms, "are not entitled to rely on the protective jurisdiction of the bankruptcy court."[57] The failure to give proper notice and to seek approval of the plan from the bankruptcy court "precluded a legitimate basis for enjoining the Alaska state court action."[58]

### D. Journal Articles as Inadmissible Hearsay

■ Savage Arms argues that the superior court abused its discretion by considering journal articles Western Auto submitted in support of its summary judgment motion. These articles included statements attributed to Savage Arms' chief executive officer supporting Western Auto's argument that Savage Arms holds itself out to the world as the legal successor to Savage Industries. Savage Arms asserts that the articles contain multiple levels of hearsay. Since we remand for other reasons, it is unnecessary to discuss this issue at length. But we address it briefly here because it may recur on remand. For purposes of our discussion, we assume that the CEO uttered the statements attributed to him.

In effect, the statements were uttered at least twice, first by Savage Arms' CEO and ultimately by the articles' authors upon publication. When the statements were first uttered, the declarant was Savage Arms' CEO and the statements were not hearsay, because they were admissions by a party-opponent.[59] But when the articles were offered to prove the truth of their assertions—that the CEO had made the statements the articles attributed to him—their authors became the declarants whose out-of-court statements were being offered into evidence. If the articles were offered for their truth, they normally would have been inadmissible hearsay.[60] The superior court rejected Savage

Arms' hearsay objection, but so far as we can tell from the record, did not address the author-as-declarant issue. Whether it must do so on remand depends on whether the articles are offered for the truth of the matters they assert.

### E. Real Parties in Interest

■ Western Auto's liability insurers, Allstate Insurance Company and Certain Underwriters at Lloyd's of London (Underwriters), fully paid the expenses of defending and settling the Taylor lawsuit against Western Auto. Savage Arms moved to substitute the insurers as the plaintiffs in Western Auto's indemnity action. Savage Arms claimed that the insurers were the only real plaintiffs in interest under Alaska Civil Rule 17(a).[61] The superior court denied the motion, but at Western Auto's suggestion allowed the insurers to ratify the action or be subject to substitution.

We agree with Savage Arms that it was error not to substitute Western Auto's insurers as the real parties in interest. Western Auto admits that Allstate and the Underwriters are its fully subrogated insurers. Western Auto has identified no possible remaining interest it has in the indemnity claim. The superior court reasoned that Western Auto had an interest in the claim that was "difficult to define," and that joinder of the insurers might present an inaccurate picture to the jury. The court did not explain what Western Auto's interest was.

Although we have not previously addressed the proper procedural treatment of fully subrogated insurers, we held in *Municipality of Anchorage v. Baugh Construction & Engineering Co.*[62] that ratification by partially subrogated insurers is an acceptable

57. *Id.*

58. *Id.* at 722.

59. *See* Alaska R. Evid. 801(d)(2) (defining statements by party opponents as non-hearsay).

60. Alaska R. Evid. 802.

61. Alaska Civil Rule 17(a) provides in relevant part:
 Every action shall be prosecuted in the name of the real party in interest.... [A] party with

whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought.... [R]atification, joinder, or substitution [of the real party in interest] shall have the same effect as if the action had been commenced in the name of the real party in interest.

62. 722 P.2d 919 (Alaska 1986).

substitute for joinder.[63] We there reasoned that Rule 17(a) did not require joinder of a partially subrogated insurer because ratification satisfied the policy concerns underlying that rule.[64] We explained that ratification is generally adequate in cases involving partially subrogated insurers because it protects against multiple lawsuits, ensures that the interested party makes a formal appearance in court, ensures that the party is subject to any court orders concerning discovery or attorney's fees, and assures that all interested parties bear the burdens of claims litigated on their behalf.[65] Implicitly acknowledging the key distinction between partially and fully subrogated insurers, we noted that the insured party was not a sham plaintiff because its claim had not been paid in full by the insurer:

> We further note that [the insurer's] absence as a named party in this case does not mean that the action would be prosecuted by a sham plaintiff. The municipality was a real party in interest as the amount of its claim had not been paid in full by [the insurer].[66]

This language implies that where, as here, the insurer *has* paid the full amount, the insured would be a sham plaintiff.

We have relied before on a Montana Supreme Court case, *State ex rel. Nawd's T.V. & Appliance Inc. v. District Court*,[67] in determining the proper procedural treatment of insurers.[68] The plaintiffs in *Nawd's T.V.* had received varying levels of compensation from their partly and fully subrogated insurers.[69] Although the court held that partially subrogated insurers could opt for ratification rather than substitution or joinder, it effectively upheld a lower court's ruling requiring substitution of fully subrogated insurers.[70]

Critical commentary bears out the significance of this distinction:

> The general rule in the federal courts is that if the insurer has paid the entire claim, it is the real party in interest and must sue in its own name. If no money or enforceable promise to pay money has been advanced, then there has not been any subrogation and the insured remains the real party in interest. This seems sound since it is logical that an insured who has no interest in the outcome of the litigation may not bring suit.[71]

We find this reasoning persuasive, and conclude that it was error not to require the insurers to substitute for their insured.

## IV. CONCLUSION

We REVERSE the order denying Savage Arms' motion to require Western Auto's insurers to substitute for Western Auto, VACATE the orders imposing successor liability on Savage Arms, and REMAND for application of the doctrines adopted today and for further proceedings.

---

**63.** *See id.* at 926.

**64.** *See id.* at 925–26.

**65.** *See id.*

**66.** *Id.* at 926.

**67.** 168 Mont. 456, 543 P.2d 1336 (1975).

**68.** *See Baugh,* 722 P.2d at 926.

**69.** *See Nawd's T.V.,* 543 P.2d at 1337.

**70.** *See id.* at 1338–39.

**71.** 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1546, at 355–56 (2d ed.1990) (footnotes omitted).