Hillsborough-northern judicial district
No. 2002-180

BARBARA BIELAGUS & a.

v.

EMRE OF NEW HAMPSHIRE CORP., D/B/A CARLSON REAL ESTATE
BETTER HOMES AND GARDENS AND NORWOOD REALTY BETTER HOMES
AND GARDENS

Argued: February 6, 2003
Opinion Issued: July 1, 2003

*Wenger & Cronin, P.C.*, of Manchester (*John G. Cronin* and *John F. Bisson* on the brief, and *Mr. Cronin* orally), for the plaintiffs.

*Murphy & Michaels, LLP*, of Boston, Massachusetts (*Daniel J. Murphy & a.* on the brief, and *Anthony M. Ambriano* orally), for the defendant.

NADEAU, J. The plaintiffs, Barbara Bielagus and The Norwood Group, Inc., appeal from an order entered after a bench trial in the Superior Court (*Brennan*, J.), which ruled that the defendant, EMRE of New Hampshire Corp., was not liable for the plaintiffs' judgment against the defendant's predecessor on a promissory note. We affirm.

*I. Historical Background*

The relevant facts are not in dispute. The plaintiffs are the holders of a $1,000,000.00 promissory note executed by the defendant's predecessor, The Norwood Realty, Inc. (Norwood Realty), in 1986. Norwood Realty executed the promissory note as part of a $4.6 million dollar financing package to purchase the commercial division of The Norwood Group, Inc. *See. Slattery v. Norwood Realty*, 145 N.H. 447, 447-48 (2000). The other $3.6 million dollars of the financing package consisted of a secured loan

owed to the Federal Deposit Insurance Corporation (FDIC), which was personally guaranteed by Norwood Realty's sole shareholders, Robert and Rose Marie Phillips.

Sometime in 1992, Norwood Realty defaulted on its promissory note with an outstanding balance of $530,000.44. It apparently also fell behind on its secured obligation to the FDIC. By 1995, Norwood Realty's financial difficulties caused it to begin soliciting offers for the sale of its business so that it could avoid total liquidation. While Norwood Realty was engaging in negotiations to work out its financial difficulties, the plaintiffs filed suit for the balance due on the promissory note.

After a jury trial, the plaintiffs obtained a verdict against Norwood Realty for the $530,000.44 balance due. We affirmed that verdict in *Slattery v. Norwood Realty*, 145 N.H. at 447, and the trial court entered final judgment in early 2001. The promissory note underlying the judgment, however, was neither secured by Norwood Realty's assets nor guaranteed by its shareholders. Consequently, the judgment remains unpaid.

Meanwhile, in March 1995, after extended negotiations with several interested parties, Norwood Realty agreed to sell virtually all of its business assets, including the Norwood Realty trade name, to the defendant. At the time of this agreement, Norwood Realty was a New Hampshire corporation in good standing, wholly owned and operated by Robert and Rose Marie Phillips. Norwood Realty engaged in both commercial and residential real estate transactions, and operated out of ten branch offices across New Hampshire.

As part of this agreement, the defendant incorporated in New Hampshire as the New Hampshire subsidiary of Eastern Massachusetts Real Estate Corporation (EMRE). At that time, EMRE was a Massachusetts corporation in good standing, wholly owned by Jean Carlson and operated by her husband, Richard Carlson. EMRE engaged solely in residential real estate transactions, and operated out of more than twenty branch offices across Massachusetts.

The asset purchase agreement (Agreement) provided that the defendant would pay Norwood Realty $675,000.00 for its real estate business assets with the consent of the FDIC, after working out a plan for the multi-million dollar secured debt from the 1986 financing agreement. The Agreement also provided that the defendant would assume substantially all of Norwood Realty's operating expenses and accounts payable that related to its residential real estate division. In exchange, the defendant received almost all of Norwood Realty's business assets from its former residential real estate division. These assets included, among other things, all furniture, fixtures, leases, license agreements, real estate listing

agreements, independent broker agreements, and Norwood Realty's operating trade name.

The defendant purchased assets only from Norwood Realty's residential real estate division. Consequently, the Agreement required Norwood Realty's shareholders to change Norwood Realty's trade name and execute non-competition agreements. The Agreement further required the defendant to offer employment to substantially all of Norwood Realty's independent residential real estate brokers, and it required two-year employment contracts to be made with Norwood Realty's former officers, Robert and Rose Marie Phillips. The Agreement did not require the defendant to transfer shares of any corporate stock to Norwood Realty's former officers.

Finally, the Agreement disclosed the existence of the plaintiffs' lawsuit on the promissory note. The Agreement provided that the defendant "shall not assume and shall not be obligated to pay any of the liabilities or obligations of [Norwood Realty], except liabilities and obligation [sic] accruing after the Closing Date ... and certain accounts payable as set forth in Section 2.2."

Since purchasing Norwood Realty's residential real estate assets, the defendant has operated from the same New Hampshire branch offices with substantially the same residential real estate brokers as Norwood Realty's former residential real estate division. Pursuant to their employment contracts, Norwood Realty's former officers have worked for the defendant in management positions and have run the defendant's New Hampshire subsidiary. Through this transaction with EMRE, Norwood Realty became part of the largest New England network of realtors, as well as part of the national Better Homes and Gardens network of realtors.

Since selling assets to the defendant, the former Norwood Realty, Inc., remains a New Hampshire corporation in good standing, but operates under the trade name "Robert Spencer Real Estate Associates." Robert and Rose Marie Phillips remain the sole shareholders in this corporation. Robert Phillips, Norwood Realty's former president and CEO, has also incorporated the Granite Commercial Group, Inc. (Granite), to continue the operations of Norwood Realty's former commercial real estate division. Granite employs each of Norwood Realty's former independent commercial real estate brokers, but Granite's sole shareholder is Robert Phillips.

## II. Procedural Background

After selling its assets, Norwood Realty gave all proceeds from the sale to the FDIC to satisfy its secured debt. Consequently, Norwood Realty

had no funds remaining to pay the plaintiffs' unsecured claim. The plaintiffs, therefore, sought to impose liability for the judgment on the defendant, arguing that it is the successor to Norwood Realty's residential real estate business.

The plaintiffs' original complaint alleged five counts against the defendant and Granite; three based upon varying theories of successor liability and two grounded in debt. Prior to trial, the trial court bifurcated the two counts in debt and scheduled a three-day bench trial on the equitable claims of successor liability. The trial court ruled, over the defendant's objection, that it would apply the rule of successor liability articulated in *Kleen Laundry & Dry Cleaning v. Total Waste Mgt.*, 817 F. Supp. 225 (D.N.H. 1993) (*Kleen Laundry I*), and other federal cases.

After hearing three days of testimony, the trial court ruled that the defendant was not liable for the judgment on the promissory note under either the "mere continuation" or the "*de facto* merger" theory of successor liability, and Granite was not liable for the judgment under the "fraudulent transfer" theory of successor liability. *Cf. Kleen Laundry I*, 817 F. Supp. at 230-31. Because the trial court found that neither the defendant nor Granite could be held liable for the plaintiffs' judgment as a matter of law, it dismissed the plaintiffs' two counts for debt. This appeal followed.

## III. Discussion

On appeal, the plaintiffs challenge only the trial court's rulings in favor of this defendant; the plaintiffs do not challenge the rulings in favor of Granite. The defendant, in turn, challenges the trial court's adoption of the articulation of successor liability in *Kleen Laundry I*, and invites us to rule that the "mere continuation" doctrine of successor liability does not apply to commercial contract cases in New Hampshire.

### A. Standard of Review

We review the trial court's determination of the applicable law, and its application of that law to the facts of this case, for plain error. *See Fleet Bank-N.H. v. Chain Constr. Corp.*, 138 N.H. 136, 139 (1993). We review the trial court's factual findings under the clearly erroneous standard to determine if they are supported by evidence presented at trial. *See id.* "Our inquiry is to determine whether the evidence presented to the trial court reasonably supports the court's findings, and then whether the court's decision is consonant with applicable law." *Id.*

## B. The Applicable Law

We have never articulated a clear standard for successor liability in commercial contract cases. *But cf. Appeal of SAU #16 Coop. Sch. Bd.*, 143 N.H. 97, 103 (1998) (applying federal test for successor employer liability for labor obligations under collective bargaining agreements); *Simoneau v. South Bend Lathe, Inc.*, 130 N.H. 466, 469-70 (1988) (rejecting "product line" and "risk-spreading" theories of successor liability in products liability actions); *Russell v. Philip D. Moran, Inc.*, 122 N.H. 708, 710-11 (1982) (denying motion to dismiss contractual indemnification and warranty claims because they may be viable under a theory of successor liability); *Zimmerman v. Suissevale, Inc.*, 121 N.H. 1051, 1054-55 (1981) (affirming imposition of successor liability under stock purchase agreement).

■ The standard for successor liability, applied by the trial court and articulated in *Kleen Laundry I*, 817 F. Supp. at 230-31, begins with the general rule of commercial law that a corporation purchasing the assets of another corporation is not liable for the seller's debts. *See id.* at 230. This rule is consistent with our statute that allows, in the regular course of business, free alienability of corporate assets to maximize their productive use. *See* RSA 293-A:12.01 (1999). It also is consistent with our recognition that an ordinary contract will not bind an unconsenting successor to a contracting party. *See Appeal of SAU #16*, 143 N.H. at 103.

■ There are judicially recognized exceptions to this rule, however, intended to prevent corporations from evading their business obligations to creditors by selling their assets. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 266 (1st Cir. 1997). The four most common exceptions are: (1) when the purchasing corporation expressly or impliedly agrees to assume the obligations of the selling corporation; (2) when the asset transfer amounts to a *de facto* merger of the two corporations; (3) when the purchasing corporation becomes a "mere continuation" of the selling corporation; and (4) when the transaction is fraudulent because its only purpose is to evade corporate liability. *See, e.g., Kleen Laundry I*, 817 F. Supp. at 230; *Welco Industries, Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1132 (Ohio 1993). Only the second and third exceptions are at issue in this case.

### 1. De Facto Merger Exception

■ The plaintiffs argue the trial court erred in finding that the asset sale agreement between the defendant and Norwood Realty did not constitute a *de facto* merger. Under the *de facto* merger exception, successor liability

will be imposed "if the parties have achieved virtually all of the results of a merger" without following the statutory requirements for merger of the corporations. *Kleen Laundry I*, 817 F. Supp. at 230 (quotation omitted); *cf.* RSA 293-A:11.06 (1999) (Effect of Merger or Share Exchange). By statute, for two corporations to merge in New Hampshire:

(1) Every other corporation party to the merger merges into the surviving corporation and the separate existence of every corporation except the surviving corporation ceases.

(2) The title to all real estate and other property owned by each corporation party to the merger is vested in the surviving corporation without reversion or impairment.

(3) The surviving corporation has all liabilities of each corporation party to the merger.

(4) A proceeding pending against any corporation party to the merger may be continued as if the merger did not occur or the surviving corporation may be substituted in the proceeding for the corporation whose existence ceased.

(5) The articles of incorporation of the surviving corporation are amended to the extent provided in the plan of merger.

(6) The shares of each corporation party to the merger that are to be converted into shares, obligations, or other securities of the surviving or any other corporation or into cash or other property are converted, and the former holders of the shares are entitled only to the rights provided in the articles of merger or to their rights under RSA 293-A:13.01 through 293-A:13.31.

RSA 293-A:11.06 (a).

In contrast, a *de facto* merger occurs when a company is completely absorbed into another through a sale of assets; continues its operations by maintaining the same management, personnel, assets, location and stockholders; but leaves its creditors without a remedy for its outstanding debt. *See 300 Pine Island v. Steven L. Cohen*, 547 So. 2d 255, 256 (Fla. Dist. Ct. App. 1989). The fact-finder may look to other factors indicative of commonality or distinctiveness with the corporations. *Id.* "The bottom-line question is whether each entity has run its own race, or whether there has been a relay-style passing of the baton from one to the other." *Id.* (quotation omitted).

In *Kleen Laundry I*, the court set forth four non-exclusive factors to be considered when determining if a purported sale of assets is a *de facto* merger. These factors are whether:

(1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Kleen Laundry I*, 817 F. Supp. at 230-31. These factors are consistent with those applied by other state and federal courts. *See, e.g., Welco Industries*, 617 N.E.2d at 1134; *Gallenberg Equipment, Inc. v. Agromac Intern.*, 10 F. Supp. 2d 1050, 1054 (E.D. Wis. 1998). The factor that usually "tips the scales in favor of finding a merger is continuity of ownership, usually taking the form of an exchange of stock for assets." *Devine & Devine Food v. Wampler Foods*, 313 F.3d 616, 619 (1st Cir. 2002) (applying Virginia law); *see also Welco Industries*, 617 N.E.2d at 1134.

The trial court found that the plaintiffs did not prove the existence of a *de facto* merger between the defendant and Norwood Realty. The trial court agreed with the plaintiffs that the defendant was engaging in the same residential real estate business in New Hampshire, from the same offices, with the same people and under the same name. It found, however, that this was the nature of the asset purchase agreement and not a continuation of the Norwood Realty "general business operations." Specifically, the trial court found: "Inherent in an asset transfer is the purchaser's right to operate in the business to which the assets are suited, and to use the transferor's trade name if the asset purchase agreement so provides. . . . Corporations purchase assets in order to use them; to do otherwise would constitute waste." We agree.

While there is evidence of some continuity of Norwood Realty's residential real estate operation through the defendant's physical location, management, personnel and assets, there is no continuity of shareholders, nor any evidence of payment of the acquired assets with the defendant's stock. Furthermore, Norwood Realty did not cease its ordinary business operations and liquidate. Rather, it formed two new corporations, one

responsible for the Norwood Realty legal obligations and one continuing Norwood Realty's commercial real estate operations. Notably, the promissory note underlying this litigation was incurred to purchase Norwood Realty's commercial real estate division, *see Slattery*, 145 N.H. at 447-48, which continues operations as Granite Realty and is no longer a party to this suit. Finally, while there is evidence that the defendant assumed the business obligations required to continue the Norwood Realty residential real estate operation, it did not assume any obligations of the commercial real estate division and it expressly disclaimed Norwood Realty's known legal obligations incurred prior to the closing date of the Agreement.

We hold that the *Kleen Laundry I* factors for finding a *de facto* merger apply to commercial asset sales in New Hampshire. Applying this standard in this case, each of the trial court's findings is supported by the evidence. We note, also, that the trial court's application of the *Kleen Laundry I* legal standard accords with the standards applied in other jurisdictions dealing with commercial contracts for asset sales. *Cf. Welco Industries*, 617 N.E.2d at 1134.

■ In traditional corporate law, the key factors to finding a *de facto* merger are the exchange of stock and continuity of ownership, because the shareholders are the indirect beneficiaries of any increase in a corporation's assets or any decrease in its liabilities. *See National Gypsum Co. v. Continental Brands Corp.*, 895 F. Supp. 328, 333-34 (D. Mass. 1995); *see also Numerica Savings Bank v. Mountain Lodge Inn*, 134 N.H. 505, 512 (1991). The existence of these factors suggests an asset sale is not actually a *bona fide* business transaction, *see Gallenberg Equipment*, 10 F. Supp. 2d at 1054, because shareholders would be allowed to evade corporate obligations merely by "passing the relay baton" and continuing their race in the free market under another name. *See 300 Pine Island*, 547 So. 2d at 256.

Likewise, under our own commercial jurisprudence, we have never hesitated to disregard corporate fiction when it appears that the shareholders may have committed a fraud or that the circumstances will lead to an inequitable result. *See, e.g., Terren v. Butler*, 134 N.H. 635, 639-40 (1991). The key factor for piercing the corporate veil, however, is the conduct of the shareholders. *See id.* at 640-41. When, as here, there is no exchange of stock, no continuity of shareholders and more than one corporation remains in the free market race, we agree with those courts reluctant to impose successor liability by *de facto* merger upon a corporation. *See, e.g., Gallenberg Equipment*, 10 F. Supp. 2d. at 1056. In short, if the results of a statutory merger are not achieved, then "the *de*

*facto* merger doctrine is not the prescription." *Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873, 892 (Mich. 1976) (Coleman, J. dissenting).

Under our merger statute, the results of a merger are that one corporation completely absorbs all of the assets, personnel, and stock of another corporation, and the absorbed corporation ceases to exist. *See* RSA 293-A:11.06 (a). Then, because the absorbing corporation has assumed all of the benefits of the absorbed corporation, it is required by statute to assume all liabilities as well. *See id.*

Norwood Realty and the defendant were strangers before this transaction. Essentially, they were competitors in the race for the New Hampshire residential real estate market, but Norwood Realty's race ended with its financial difficulties. Rather than passing the baton to the defendant to continue its entire existing business and assume its liabilities, Norwood Realty sold its residential real estate assets, paid its secured debts, changed its trade name and continued its race in the commercial real estate market. Indeed, Norwood Realty remains a viable corporation, which may choose to re-enter the residential real estate race when its shareholders' non-competition agreements expire.

■ The defendant paid for Norwood Realty's residential real estate assets and assumed many of Norwood Realty's obligations, but it expressly disclaimed liability for the plaintiffs' promissory note. The plaintiffs do not claim that the defendant gave Norwood Realty inadequate consideration for its assets. Nor do the plaintiffs claim that the defendant committed fraud. Accordingly, we do not find a *de facto* merger.

### 2. Mere Continuation Exception

■ The plaintiffs argue the trial court erred in finding that the defendant was not a "mere continuation" of Norwood Realty, or a "continuity of the [Norwood Realty] enterprise." Similar to the *de facto* merger exception, "[u]nder the traditional application of the 'mere continuation' exception, the court should not find a corporation to be the continuation of a predecessor unless only one corporation remains after the transfer of assets and unless there is an identity of stock, stockholders and directors between the two corporations." *Kleen Laundry I*, 817 F. Supp. at 231 (quotation omitted).

This traditional theory envisions a corporate reorganization where one company sells its assets to another company under the same ownership. *See Welco Industries*, 617 N.E.2d at 1134. Successor liability is imposed upon the purchasing corporation because the purchaser is merely the seller reincarnated as a different entity. *See id.* While continuity of ownership is the key factor for imposing successor liability under this

exception, some courts also look to the adequacy of the consideration given in the asset sale and to whether there is evidence of a purchase made in good faith. *See id.; see also G.P. Publications v. Quebecor Printing*, 481 S.E.2d 674, 680 (N.C. Ct. App. 1997).

The trial court did not apply the traditional commercial application of this legal doctrine. Rather, it applied an expansion of this exception known as the "continuity of the enterprise" or "substantial continuity" theory of successor liability. *See Kleen Laundry I*, 817 F. Supp. at 231; *Kleen Laundry & Dry Clng. v. Total Waste Management*, 867 F. Supp. 1136, 1140 (D.N.H. 1994) ("*Kleen Laundry II*"). This theory does not require proof of continuity of ownership to impose liability. *See Kleen Laundry I*, 817 F. Supp. at 232. Rather, it requires the fact-finder to examine eight factors to determine whether a successor corporation is a "continuity of the enterprise" of its predecessor. *See id.* at 231.

■ These factors include: (1) retention of the same employees; (2) retention of the same supervisors; (3) retention of the same production facilities; (4) production of the same product; (5) use of the same name; (6) continuity of assets; (7) continuity of business operations; and (8) representation as the same corporation to others. *Id.* We note that these are the same factors we apply when looking for "substantial continuity" to impose successor liability on an employer for a previously negotiated collective bargaining agreement. *Cf. Appeal of SAU #16*, 143 N.H. at 103. We find that this expanded exception to the laws of successor liability is not applicable when dealing with a traditional commercial contract for the sale of corporate assets.

The traditional "mere continuity" exception in successor liability law developed through cases involving contracts, tax liabilities, and shareholder rights. *See Welco Industries*, 617 N.E.2d at 1132. In recent years, many courts have criticized the formality of this exception because it causes inequitable results when it is rigidly applied to cases brought under federal remedial statutes such as the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq., see, e.g., Kleen Laundry I*, 817 F. Supp. at 233, or under state products liability laws, *see, e.g., Turner*, 244 N.W.2d at 881-82. Many of these courts have observed that plaintiffs seeking to file a products liability or environmental cleanup suit often were faced with no available remedy for the "wrongs of long-dead corporate entities." *National Gypsum*, 895 F. Supp. at 338 (listing cases).

Therefore, to achieve the remedial public policies underlying environmental cleanup, labor relations and tort law, some courts have expanded the "mere continuity exception" and developed two broader

theories where successor liability may be imposed. *See G.P. Publications*, 481 S.E.2d at 682. These exceptions are the "product-line" theory of successor liability, which we, along with most jurisdictions, have expressly rejected, *see Simoneau*, 130 N.H. at 470, and the "continuity of enterprise" or "substantial continuity" theory, *see Kleen Laundry I*, 817 F. Supp. at 231, which was applied by the trial court in this case.

While the federal court consistently has applied the "substantial continuity" theory in products liability cases, *see, e.g., Kelly v. Kercher Mach. Works, Inc.*, 910 F. Supp. 30, 31 (D.N.H. 1995), and in CERCLA cases, *see, e.g., Kleen Laundry II*, 867 F. Supp. at 1140, neither we nor the majority of state courts have adopted the doctrine for either tort or contract cases. *But cf. Appeal of SAU #16*, 143 N.H. at 103 (applying theory for labor management of collective bargaining agreement). We see no need to do so now because this expansive theory of successor liability, however valid in federal courts, is grounded upon public policies that are not applicable to traditional commercial and contract law, which are governed by predictability of results and the intentions of the parties. *See G.P. Publications*, 481 S.E.2d at 681-82; *Welco Industries*, 617 N.E.2d at 1133.

Likewise, in products liability cases, we consistently have rejected the doctrine of "risk-spreading" upon which the "substantial continuity" theory is based. *See Simoneau*, 130 N.H. at 470. Many state courts and products liability treatises cite to our federal cases such as *Kleen Laundry I & II*, and *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir. 1974), for the proposition that New Hampshire is one of three States that have adopted the "substantial continuity" exception to successor liability based upon the policy of risk-spreading. *See, e.g., Savage Arms, Inc. v. Western Auto Supply*, 18 P.3d 49, 56 (Alaska 2000) (citing RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 12 Reporters' Note at 217-18). Thus, we take this opportunity to reiterate our *Simoneau* ruling that "to the extent *Cyr* does suggest that we embrace risk spreading, it is no longer a valid interpretation of New Hampshire law." *Simoneau*, 130 N.H. at 470. We join the majority of jurisdictions which adhere to the traditional "mere continuation" exception to the prohibition against successor liability.

While we find that the "continuity of enterprise" exception should not have been applied in this case, the trial court's factual findings dictate the same result under the applicable "mere continuation" theory.

The trial court found, and the evidence shows, that three distinct entities existed after the defendant's purchase of Norwood Realty's residential real estate assets: (1) Robert Spencer Real Estate Associates, wholly owned by Robert and Rose Marie Phillips; (2) Granite Commercial

Group, wholly owned by Robert Phillips; and (3) the defendant, EMRE, wholly owned by Jean Carlson. These three separate entities with different owners preclude successor liability from being imposed under the "mere continuation" exception as a matter of law. *See Welco Industries*, 617 N.E.2d at 1134-35. We hold, therefore, that the trial court's factual finding that the defendant had no successor liability for the plaintiffs' judgment is correct as a matter of law.

## C. Remaining Issues

The plaintiffs challenge two of the trial court's factual findings, which they argue change the outcome of this appeal. First, the plaintiffs challenge an inconsistency between the trial court's narrative opinion and its rulings on the plaintiffs' individual requests for factual findings. We find that any inconsistency between these factual findings, if one even exists, does not affect the outcome of this case because it does not affect the legal analysis under either exception to the prohibition against successor liability.

Next, the plaintiffs argue that the trial court erred when it ruled that the defendant's non-competition agreements with Norwood Realty's shareholders did not amount to a transfer of equity in the defendant's corporation. Effectively, the plaintiff is arguing that Norwood Realty's shareholders became *de facto* owners of the defendant through a *de facto* merger of the two corporations. This argument is based upon the $400,000 payments each of Norwood Realty's shareholders received under their non-competition agreements. The plaintiffs argue that these payments, along with the management positions the shareholders received with the defendant, amount to *de facto* ownership of the defendant.

The plaintiffs' argument is flawed in two ways. First, it ignores the *de facto* merger requirement that Norwood Realty dissolve and only one corporation remain. *See Welco Industries*, 617 N.E.2d at 1134. Second, it attempts to equate corporate ownership with operational control. *See Gallenberg Equipment*, 10 F. Supp. 2d at 1056-57.

Monetary payments do not amount to ownership equity in a corporation. Likewise, unless there is evidence that Norwood Realty's shareholders used their management positions with the defendant in some fraudulent or inappropriate way to cause the harm being complained of, there is no basis for imposing successor liability based upon *de facto* ownership through management control. *See id.* at 1057. Again, we emphasize that the plaintiffs never claimed the defendant gave Norwood Realty inadequate consideration for its assets, or otherwise engaged in fraudulent conduct. Also, we note that any management control given to Norwood Realty's

former owners remained subject to the approval of the defendant's sole shareholder, Jean Carlson. *See id.*

*IV. Conclusion*

We hold that New Hampshire law recognizes the four traditional exceptions to the prohibition against imposing successor liability in commercial law. New Hampshire, however, does not recognize the expanded "continuity of the enterprise" test for successor liability in commercial, contract or products liability law. The trial court's legal rulings are consistent with the applicable law and its factual findings are supported by the evidence.

*Affirmed.*

BROCK, C.J., and DALIANIS and DUGGAN, JJ., concurred.