Strafford
No. 2004-808

JENNY THOMPSON

v.

C&C RESEARCH AND DEVELOPMENT, LLC & a.

Argued: February 8, 2006
Opinion Issued: April 27, 2006

*Burns, Bryant, Cox, Rockefeller & Durkin, P.A.*, of Dover (*Paul R. Cox* on the brief and orally), for the plaintiff.

*D'Amante Couser Steiner Pellerin, P.A.*, of Concord (*R. James Steiner* and *Gayle M. Braley* on the brief, and *Mr. Steiner* orally), for defendants C&C Research and Development, LLC, Estate of Ralph Cutillo, Total Body Wellness Franchising, LLC, and Health-Style, USA, Inc.

HICKS, J. The plaintiff, Jenny Thompson, appeals a decision of the Superior Court (*Nadeau*, J.) concluding: (1) that no legally enforceable merger or asset purchase agreement occurred between the defendants; (2) that the record was devoid of evidence of any misappropriation of Thompson's name and likeness; and (3) that defendant Pure Distributors, Inc. (Pure) is exclusively responsible for the judgment in this case. We affirm.

The trial court found the following relevant facts. In 1998, Thompson, a former Olympic gold medal swimmer, and Matthew Freese, President and CEO of Pure, entered into an endorsement contract, whereby Pure agreed to pay Thompson scheduled sums in return for her endorsement of Pure's nutritional products and services. Under the terms of the contract, Thompson allowed Pure to use her image on its web site and promotional materials. Subsequently, Pure began to experience financial difficulties. In an effort to recover, Freese met with Ralph Cutillo, owner and operator of defendants C&C Research and Development, LLC, Total Body Wellness Franchising, LLC, and Health-Style, USA, Inc. (the Cutillo defendants). Cutillo expressed interest in purchasing Pure's assets through C&C Research and Development LLC (C&C Research) with the understanding that any such purchase would not include the assumption of Pure's liabilities.

During the ensuing negotiations, much of Pure's equipment, inventory and office supplies were delivered to C&C Research's facilities in Laconia. By December 2000, Pure's office was closed and by January 2001, most, if not all, of Pure's tangible assets were located at C&C Research's facilities. On January 9, 2001, Freese authorized Pure's product manufacturer to

produce nutritional bars and other products for C&C Research. In March 2001, Pure officially transferred its account for facilitating web site purchases to C&C Research. Despite these transfers during the early months of 2001, the parties had not yet reached a final agreement.

Negotiations continued over several months. In an attempt to reach a final agreement, Freese met with Cutillo and Cutillo's attorney, John Giere, in March 2001. Attorney Giere, who subsequently drafted an asset purchase agreement for the parties' review, was unaware of Thompson's endorsement agreement with Pure. Neither party mentioned it during the meeting.

Although products continued to be sold, Freese made no payments to Thompson. Thompson wrote to Freese on March 30, 2001, seeking payments that she had not received since June 2000. Freese responded in an April 10, 2001 letter, assuring Thompson that Pure was solely responsible for the payments owed and that a newly formed distribution company, which Freese did not identify, was not responsible for any of Pure's liabilities, including Thompson's contract.

Between March and June 2001, negotiations between Pure and the Cutillo defendants deteriorated. In a June 14, 2001 letter to Freese, Attorney Giere stated that Cutillo had rejected "any final agreement" proposal, but was leaving the door open for an asset purchase agreement. On June 27, 2001, Cutillo sent a letter informing Freese that he had rejected all proposals for either an asset purchase or a licensing agreement, and requested that Freese remove all of Pure's assets from the premises of Cutillo's company and prepare to reimburse Cutillo for sums already paid.

On August 28, 2002, Thompson filed suit in superior court against Freese, Pure, and Total Body Wellness Franchising, Inc. (TBW). Her original writ claimed that: (1) Pure breached the endorsement contract; (2) TBW was liable for this breach because it had acquired "the assets and debts" of Pure; and, alternatively, (3) if TBW did not acquire "the assets and debts" of Pure, then TBW and Cutillo were liable for invasion of privacy for the misappropriation of her name and likeness by using them on TBW's web site. On November 1, 2002, just two days after Thompson filed a voluntary nonsuit against Freese individually, she obtained a confession of judgment from Pure.

On March 31, 2004, Thompson amended her writ to name C&C Research and Health-Style USA, Inc. (Health-Style) as defendants. Thompson alleged that Pure's assets and debts had been acquired by TBW as of January 2001, and that the two new defendants participated in, or were responsible for, "the acquisition of [Pure and] the breach of contract and misappropriation of [her] name and likeness without authorization."

Following a consolidated bench trial, the trial court entered judgment in favor of Thompson for $265,000 against Pure, but judgment in favor of the remaining defendants on all claims.

On appeal, Thompson argues that the trial court erred by: (1) finding that the Cutillo defendants were not liable for the misappropriation of her image; (2) failing to consider her alternative claims of quantum meruit, quasi-contract, and unjust enrichment; (3) ruling that Pure's acceptance of sole responsibility precluded her from seeking damages for the misappropriation of her image from the Cutillo defendants; and (4) ruling that no *de facto* merger occurred between Pure and the Cutillo defendants.

We will not disturb the findings of the trial court unless they lack evidentiary support or are erroneous as a matter of law. *Miller v. Slania Enters.*, 150 N.H. 655, 659 (2004). Legal conclusions, as well as the application of law to fact, are reviewed independently for plain error. *Id.* Accordingly, our inquiry is to determine whether the evidence presented to the trial court reasonably supports its findings, and then whether the court's decision is consonant with applicable law. *Id.* Finally, we review questions of law *de novo*. *Id.*

*I. Misappropriation*

Thompson first contends that the trial court erred by finding that there was no evidence that the Cutillo defendants misappropriated her image. She asserts that the Cutillo defendants either assumed her endorsement contract or misappropriated her image. We disagree.

In its final order, the trial court stated:

> At the time Freese began to transfer assets to C and C Research, Pure operated a web site which contained the plaintiff's endorsement and photograph. Cheryl Sivewright, web designer for Pure, testified that at no time did the web site contain a photograph of the plaintiff while it was controlled by C and C. While the plaintiff was justifiably concerned that her likeness appeared on the web site after she learned that C and C Research was attempting to acquire Pure, there is no evidence that C and C Research misappropriated her likeness at a time when it controlled the web site or related domains.

The trial court also granted requests for findings of fact that essentially confirm that neither Cutillo individually, nor any of the Cutillo defendants, ever maintained or used a website containing the likeness of Thompson.

"[A]s the trier of fact, the trial court is in the best position to assess and weigh the evidence before it because it has the benefit of observing the parties and their witnesses." *In re Adam M.*, 148 N.H. 83, 84 (2002).

Cheryl Sivewright testified that at no time did a company controlled by Cutillo ever control or operate a website with Thompson's photograph or likeness on it. On the contrary, she testified that Pure had exclusive control of such website. As such, we conclude that a reasonable fact finder could have found as the trial court did.

Thompson also argues that the Cutillo defendants misappropriated her image by distributing catalog pamphlets that contained her image and endorsement. The record suggests that the Cutillo defendants did in fact distribute these pamphlets, but such use did not constitute misappropriation.

The trial court found that any use of the pamphlets containing the likeness of Thompson by the Cutillo defendants was pursuant to an initial licensing agreement between Pure and the Cutillo defendants that was consistent with Thompson's endorsement contract. Specifically, the trial court found that Pure and C&C Research entered into an initial licensing agreement, the terms of which required payments by C&C Research and a percentage of profits in exchange for permission to use "inventory, equipment, customer lists, sales and marketing materials" of Pure, and that C&C Research paid $82,500 to Pure towards satisfaction of this initial licensing agreement.

Thompson argues that the findings of the trial court concerning an initial licensing agreement are inconsistent with its finding in the final order that "there was no meeting of the minds." Although the trial court's order does suggest that what occurred between Freese and Cutillo between November 2000 and June 2001 amounted to continued negotiations, we conclude that the parties' course of conduct supports the trial court's finding of an initial licensing agreement.

In *Remsburg v. Docusearch*, 149 N.H. 148, 157 (2003), we adopted the tort of invasion of privacy by the appropriation of an individual's name or likeness. *See* RESTATEMENT (SECOND) OF TORTS § 652C comment *a* at 381 (1977). Under our decision in *Remsburg*, liability under this theory occurs when one "appropriates to [their] own use or benefit the name or likeness of another." *Remsburg*, 149 N.H. at 157 (citation omitted). In *Remsburg*, we also recognized that such an appropriation "occurs most often when the person's name or likeness is used to advertise the defendant's product." *Id.* at 158 (citations omitted).

■ An individual has an interest in controlling the use of his or her own name or likeness insofar as a benefit may be derived from its use, but when the individual authorizes another and its licensee to use his or her name or likeness under the terms of a contract, such authorization precludes a finding that either the contractual party or its licensee is liable

for misappropriation. *See Neal v. Electronic Arts, Inc.*, 374 F. Supp. 2d 574, 579 (W.D. Mich. 2005) (granting summary judgment in favor of licensee in a misappropriation action by a National Football League player because player's contract allowed for assignment of player's name and likeness to licensees of the contracting entity). The endorsement contract between Thompson and Pure expressly authorized Pure *or its licensees* to use Thompson's endorsement for the products designated in the agreement. The conduct of Cutillo and Freese created such a licensing agreement under which the parties operated while continuing to negotiate terms of a potential asset purchase or final licensing agreement. *See Harrison v. Watson*, 116 N.H. 510, 511 (1976) (stating that contracts may be established by spoken or written words or by acts or conduct); *see also Tsiatsios v. Tsiatsios*, 140 N.H. 173, 178 (1995) (noting that contractual offers may be accepted by performance).

Accordingly, the conduct of Freese and Cutillo supports the trial court's finding that Pure and the Cutillo defendants entered into an initial licensing agreement. We hold that the trial court did not err in its finding that any use by the Cutillo defendants of the pamphlets containing Thompson's likeness occurred pursuant to the initial licensing agreement.

*II. Quantum Meruit, Quasi-contract, and Unjust Enrichment*

Thompson argues that the trial court erred by failing to address her restitutionary claims of unjust enrichment, quasi-contract, and quantum meruit. Thompson alleges that this error was brought to the trial court's attention in her motion for reconsideration of the verdict. Specifically, she states that her post-trial motion "pointed out that the Court's final order failed to address the issue of unjust enrichment of the defendants by allowing them to benefit from the endorsement contract, while denying [her] compensation for the use of her image and endorsement." For the following reasons, we rule that the trial court did not err in failing to address these claims.

The theories of quantum meruit and quasi-contract first appeared in the brief that Thompson filed in this appeal. It cannot be said that the trial court committed an error in failing to consider theories of relief that Thompson failed to raise until the appellate stage of the process. *McGrath v. Town of Canaan*, 147 N.H. 623, 626 (2002) (refusing to consider claim made for the first time on appeal). As for unjust enrichment, the first articulation of this theory appears in the written closing arguments submitted after the trial. As such, the Cutillo defendants were not put on timely notice that relief was being sought on a theory of unjust enrichment. We conclude that the trial court did not err by failing to

consider a theory of relief that was not timely pled. *See Perron v. Aranosian*, 128 N.H. 92, 95 (1986) (court did not err in refusing to consider theory of unjust enrichment not properly raised before trial).

### III. Pure's Acceptance Of Sole Responsibility

Thompson next argues that the trial court erred as a matter of law to the extent that it ruled that Freese's representations as to Pure's sole responsibility under the endorsement contract precluded her from seeking damages against the Cutillo defendants for the wrongful use of her image. Upon review of the record, we find no support for the claim that the trial court so ruled. The trial court did not explicitly or implicitly rule that Freese's representations precluded Thompson from pursing claims for damages against the Cutillo defendants for the misappropriation, or wrongful use, of her image.

### IV. De facto Merger

Finally, Thompson argues that the trial court erred as a matter of law in ruling that the Cutillo defendants were not liable for the assumption of her endorsement contract under a theory of *de facto* merger.

The standard for successor liability starts with the general rule that "a corporation purchasing the assets of another corporation is not liable for the seller's debts." *Bielagus v. EMRE of N.H.*, 149 N.H. 635, 640 (2003).

One exception to the general rule applies when an asset transfer amounts to a *de facto* merger of the two entities. *Id.* In addressing whether the Cutillo defendants were obligated to pay Thompson under the theory that they effectively merged with Pure and thus acquired the endorsement contract, the trial court properly considered the non-exclusive factors set forth in *Bielagus*, which ask whether:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.
>
> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Id.* at 642.

In applying the above factors, the trial court found the following:

First, the physical location of the two businesses remained separate. Second, C and C Research continued with the same management or personnel. Third, there was no evidence to suggest that C and C Research paid for any of Pure's assets with shares of its own stock. Finally, there was no evidence that Pure ceased to exist upon transfer of its assets to C and C Research.

█ Contrary to the arguments advanced by Thompson, the trial court's findings with respect to the first three factors under *Bielagus* are amply supported by the evidence. While the trial court made no explicit finding regarding the fourth factor, it had no need to do so. The evidence under the first three factors supports the trial court's ruling that no *de facto* merger occurred regardless of whether C&C Research assumed the obligations of Pure ordinarily necessary for the uninterrupted continuation of normal business operations.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.