Hillsborough-northern judicial district
No. 2006-558

## J.G.M.C.J. CORP.

v.

## C.L.A.S.S., INC. *& a.*

Argued: March 21, 2007
Opinion Issued: May 15, 2007

*Cronin & Bisson, P.C.*, of Manchester (*John F. Bisson* and *John C. Cronin* on the brief, and *Mr. Cronin* orally), for the plaintiff.

*The McCormack Firm, LLC*, of Boston, Massachusetts (*Joseph H. Aronson* on the brief and orally), for defendants C.L.A.S.S., Inc. and R. Bruce Westaway, Barry Faye, Steve Larochelle, Bill Dahl, Ray G. Decker, Jr. and Dennis DiZoglio, as members of the board of directors of C.L.A.S.S., Inc.

*Jantzen & Associates, P.C.*, of Boston, Massachusetts (*Christopher M. Jantzen* on the brief and orally), and *Sulloway & Hollis, P.L.L.C.*, of Concord (*Timothy A. Gudas* on the brief) for defendants R. Bruce Westaway, Barry Faye, Steve Larochelle, Bill Dahl, Ray G. Decker, Jr. and Dennis DiZoglio, as members of the board of directors of Goodwill Industries of Merrimack Valley, Inc.

GALWAY, J. The plaintiff, J.G.M.C.J. Corp. (JGMCJ), appeals orders of the Trial Court (*Abramson*, J.) granting the motions for summary judgment of the defendants, C.L.A.S.S., Inc. (CLASS), the members of its board of directors, and the members of the board of directors of Goodwill Industries of Merrimack Valley, Inc. (Goodwill). We affirm.

The record supports the following: Goodwill is a charitable corporation headquartered in Lowell, Massachusetts, which operates retail stores in northern Massachusetts and southern New Hampshire. In 2001, Goodwill sought to expand its retail operations. In October 2001, Ted Siegel, Goodwill's director of retail operations, presented his strategy to increase the number of stores to the Goodwill board of directors. Although the board expressed reservations about the strategy because Goodwill was experiencing financial troubles, it permitted Siegel to pursue his strategy. Siegel, therefore, hired a real estate broker to locate a property in Manchester for a new retail store.

In December 2001, Goodwill's broker identified a property in the Cohas Brook Shopping Center in Manchester, owned by JGMCJ. John B. Sullivan, Jr. is the president, secretary, treasurer and sole shareholder of JGMCJ. In the spring of 2002, Siegel began lease negotiations with Sullivan.

Meanwhile, Goodwill approached CLASS about the possibility of merging their operations to improve Goodwill's worsening financial position. CLASS is a non-profit organization, headquartered in Lawrence,

Massachusetts, which provides vocational and other services to developmentally disabled individuals.

In May or June 2002, Stephen Celi, CLASS' chief financial officer, met with Siegel on numerous occasions to discuss Goodwill's finances and the terms of the proposed merger. On June 10, 2002, Siegel presented Goodwill's retail strategy to the CLASS board, which voted to proceed cautiously with the merger. On June 14, 2002, Goodwill and CLASS executed a non-binding Memorandum of Understanding summarizing the proposed terms of the merger. The Memorandum states that it is not intended to be a binding agreement between CLASS and Goodwill, but only outlines the terms of a potential merger.

On June 26, 2002, the boards of Goodwill and CLASS, in separate elections, elected the same individuals as directors of each board. Carol Amik, Goodwill's president, was dismissed and certain positions at the companies were realigned. Celi became the chief financial officer of both companies, and Robert Harris, CLASS' president, became Goodwill's chief executive officer. Siegel apparently left Goodwill and took a position in the retail division at CLASS. Additionally, on June 26, 2002, the CLASS board decided to execute Siegel's retail strategy, approved a motion for CLASS to co-sign store leases, and authorized the completion of the merger with a proposed closing date of August 16, 2002.

In July 2002, Goodwill and CLASS entered into a contract ("Service Agreement") under which Goodwill paid CLASS $32,395.00 per month to administer Goodwill's accounts. Pursuant to the Service Agreement, CLASS, among other things, paid Goodwill's expenses out of Goodwill's bank account and handled Goodwill's accounts receivable.

In July or August 2002, Siegel and Celi informed Sullivan that, at his request, they would provide consolidated financial statements for Goodwill and CLASS. Also, at some point during the negotiations, Siegel and Harris informed Sullivan that Goodwill and CLASS had merged.

On August 15, 2002, JGMCJ and Goodwill executed a 10-year lease for the Cohas Brook Shopping Center property. The lease was signed by Sullivan as president of JGMCJ and Harris as chief executive officer of Goodwill. The lease does not contain a third-party guaranty provision, although Sullivan had included such provisions in prior leases with other parties. At the time the lease was signed, Sullivan had not received the consolidated financial statements of Goodwill and CLASS, but testified that he believed CLASS was bound by Harris' signature on the lease. Prior to signing the lease, Sullivan had received a Dunn & Bradstreet report for Goodwill, dated July 23, 2002, that did not reflect a merger between Goodwill and any other company.

In September or October 2002, Goodwill and CLASS submitted merger documents to the Secretary of State in Massachusetts and, in November 2002, the documents were approved. Thereafter, Goodwill and CLASS prepared to submit Articles of Merger. Also in November, Sullivan received the consolidated financial information he had requested. In December 2002, before the Articles of Merger had been submitted, CLASS developed reservations about the merger because the Manchester store was not generating the level of income Goodwill and CLASS had anticipated. Therefore, the CLASS board voted to place the Articles of Merger in escrow while the financial impact of the merger was reevaluated. Also around this time, Siegel was dismissed.

In March 2003, merger discussions were terminated. The boards of the two companies each held new elections and elected different members. Harris resigned as chief executive officer of Goodwill but retained his position as president of CLASS. On August 14, 2003, Goodwill filed for bankruptcy, listing CLASS as a creditor.

Prior to the bankruptcy filing, JGMCJ began this action against Goodwill, CLASS, and their boards of directors, for breach of the August 2002 lease agreement. Although JGMCJ did not include its original writ of summons in the record, the trial court's orders state that JGMCJ brought a claim against Goodwill for breach of contract, and claims against its board for negligent misrepresentation and breach of fiduciary duty. Also, JGMCJ brought claims against CLASS and its board for breach of contract, breach of fiduciary duties and negligent concealment, breach of duties created by a *de facto* merger, and negligent misrepresentation. JGMCJ's claim against Goodwill was severed from the remaining claims due to Goodwill's bankruptcy. On the remaining claims, CLASS, its board, and Goodwill's board, moved for summary judgment, which the trial court granted. JGMCJ moved for reconsideration, which was denied. This appeal followed.

On appeal, JGMCJ contends that the trial court erred in granting summary judgment when a fact finder could conclude that CLASS is liable under Goodwill's lease as Goodwill's successor in a *de facto* merger. JGMCJ also argues that the court erred in ruling that despite misrepresentations about the merger by agents of CLASS: (1) it could not rely upon those representations; (2) it had a duty to investigate the truth of the representations; and (3) the lease should not be enforced against CLASS, regardless of the Statute of Frauds.

When reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *White v. Asplundh Tree Expert Co.*, 151 N.H. 544, 547 (2004). If our review of the

evidence does not reveal a genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the trial court's decision. *Id.* We review the trial court's application of the law to the facts *de novo. Id.*

JGMCJ first argues that the facts, when viewed in the light most favorable to it, do not support the trial court's determination that CLASS and Goodwill did not complete a *de facto* merger. It contends that a reasonable fact finder could find that Goodwill and CLASS completed a *de facto* merger, thereby imposing successor liability upon CLASS.

■ Because the parties argue that this matter is governed by New Hampshire law, we assume, without deciding, that it is. To complete a statutory merger in New Hampshire, the merging entities must meet the requirements of RSA 293-A:11.06(a) (1999). "In contrast, a *de facto* merger occurs when a company is completely absorbed into another through a sale of assets; continues its operations by maintaining the same management, personnel, assets, location and stockholders; but leaves its creditors without a remedy for its outstanding debt." *Bielagus v. EMRE of N.H.*, 149 N.H. 635, 641 (2003). In such an instance, "successor liability will be imposed if the parties have achieved virtually all of the results of a merger without following the statutory requirements for merger of the corporations." *Id.* at 640-41 (quotation omitted).

■ In *Bielagus*, we adopted a four-factor analysis to determine whether an asset sale results in a *de facto* merger. *Id.* at 641. The factors are whether:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

> (4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Id.* at 642. Additionally, "The fact-finder may look to other factors indicative of commonality or distinctiveness with the corporations." *Id.* at 641. "The bottom-line question is whether each entity has run its own race, or whether there has been a relay-style passing of the baton from one to the other." *Id.* (quotation omitted).

There is some question about the applicability of *Bielagus* to this case because there was, as noted by the trial court, no sale or transfer of assets between Goodwill and CLASS. This fact alone may defeat application of *Bielagus*. Nonetheless, because the parties' arguments rely upon *Bielagus*, we assume for purposes of this opinion that *Bielagus* applies. Applying the *Bielagus* analysis, we conclude that JGMCJ has not presented evidence sufficient to justify overturning the trial court's grant of summary judgment.

As noted, the first factor in the *Bielagus* analysis is whether there is a continuation of the enterprise of the seller corporation, Goodwill, by the buyer corporation, CLASS, so that there is continuity of management, personnel, physical location, assets, and general business operations. *Id.* at 642. JGMCJ contends that in addition to the companies' "merged" boards, the two entities operated out of the same location, all employees involved in the lease negotiations became employees of CLASS, and, after the June 2002 board meetings of Goodwill and CLASS, both companies were aware that Goodwill was incapable of paying its bills and that it survived only because CLASS infused it with cash. These facts, according to JGMCJ, demonstrate that there was a continuity of management and operations sufficient to satisfy the first *Bielagus* factor.

As to the companies' boards, each entity held its own election for board members and selected the same individuals. Therefore, the boards did not "merge" but merely had common members. Having common members does not necessarily demonstrate a continuity of management. Moreover, in looking at the results of the transaction, once merger negotiations failed, the boards of the companies held new elections in March 2003 and elected different members. Thus, there was no continuity of board membership.

Next, although JGMCJ argues that the two companies operated from the same physical location, it presented no evidence that they actually did so. In opposing summary judgment, mere denials or vague and general allegations of expected proof are not enough. *See Blagbrough v. Town of Wilton*, 145 N.H. 118, 121 (2000). The trial court concluded that each company maintained a separate address in Massachusetts at all relevant times. Because JGMCJ presented nothing other than general allegations that CLASS and Goodwill operated from the same location, we cannot say

that the trial court erred in determining that they did not have a common physical location.

Next, JGMCJ contends that apart from the board members, all of the employees involved in the merger negotiations became employees of CLASS. The evidence demonstrates that few people altered their employment in relation to this attempted merger. Celi and Harris, who were already executives of CLASS, became executives of Goodwill, one Goodwill executive was dismissed, and Siegel, a Goodwill employee, accepted a new position with CLASS. Otherwise, JGMCJ does not allege that any other person altered employment in response to this attempted merger. Thus, there was limited overlap in management of the companies and only one non-management employee of Goodwill became a CLASS employee. Furthermore, by March 2003, Harris had returned exclusively to CLASS and Siegel had been released. Therefore, looking at the results of this transaction, there was virtually no continuity of management and personnel.

Next, JGMCJ argues that as of June 2002, Goodwill and CLASS knew that Goodwill was in financial difficulty and that it could not meet its current financial obligations, much less take on a new lease, without an infusion of funds from CLASS. According to JGMCJ, this poor financial condition meant that CLASS was forced to pay Goodwill's bills. While Goodwill was clearly financially unstable as of June 2002, the boards' knowledge of this instability does not mean that CLASS was forced to fund Goodwill's financial existence. Moreover, JGMCJ's assertion that CLASS paid Goodwill's bills ignores the Service Agreement between Goodwill and CLASS that took effect in July 2002 and that required CLASS to manage Goodwill's accounts and pay Goodwill's bills out of Goodwill's accounts. JGMCJ offers no evidence that CLASS manipulated Goodwill's money outside the terms of the Service Agreement. Also, the Service Agreement permitted CLASS to make loans to Goodwill so long as they were documented on a separate general ledger and were due upon demand. In fact, CLASS is listed as one of Goodwill's creditors in bankruptcy, claiming approximately $900,000 in unpaid loans. Thus, while some money may have been transferred from CLASS to Goodwill, the evidence demonstrates that any such transfers were made pursuant to the terms of the Service Agreement.

JGMCJ contends that as of February 2003, the amount of the debt due CLASS was approximately double what should have been due under the Service Agreement and that this discrepancy creates a dispute of material fact about the financial dealings of Goodwill and CLASS. JGMCJ, however, presents no evidence of how much money Goodwill supposedly owed CLASS in February 2003, nor does JGMCJ indicate whether this

alleged discrepancy accounts for loans CLASS may have made to Goodwill. It asserts, without reference to any documents or other evidence, that there are different amounts due and that the difference creates an issue of material fact. Such vague and general allegations are insufficient to oppose summary judgment. *See Blagbrough*, 145 N.H. at 121.

Finally, JGMCJ contends that Goodwill refinanced its building in Lowell in order to extract equity that it transferred to CLASS, thus showing a transfer of assets. CLASS contends that this allegation was not raised before the trial court and is therefore waived, but, if it is not waived, the evidence shows that any funds extracted from the Lowell property were used to repay the loans it made to Goodwill. JGMCJ does not point to, and our review of the record does not reveal, any place where this allegation was raised with the trial court, nor that the trial court ever addressed the issue. Thus, because the record before us reveals no indication that this argument was raised before the trial court and the trial court's order makes no finding of fact or ruling of law on the issue, we decline to address the argument. *Rayeski v. Gunstock Area*, 146 N.H. 495, 497 (2001).

For the above reasons, we conclude that the trial court correctly found that JGMCJ did not show a continuity of Goodwill's operations by CLASS sufficient to meet the first part of the *Bielagus* analysis.

The second part of the *Bielagus* test focuses upon the continuity of shareholders from the prior enterprise to the current one. *Bielagus*, 149 N.H. at 642. As noted by the trial court, neither CLASS nor Goodwill has shares or shareholders. Thus, this factor is irrelevant.

The next factor is whether the seller company ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible. *Id.* Here, neither company ever ceased its business operations, liquidated or dissolved. In fact, after merger negotiations ceased, CLASS rebounded as a financially independent entity and Goodwill maintained its own existence, and filed for bankruptcy as an independent entity. Thus, this factor supports the conclusion that there was no passing of the baton from one entity to the other, but that each entity ran its own race. *Id.* at 641.

The final factor is whether the purchasing company assumes the obligations of the seller necessary to continue the seller's normal business operations. *Id.* at 642. CLASS never assumed any of Goodwill's obligations. While CLASS began servicing Goodwill's accounts, it did so pursuant to a contract between them and did not assume any of Goodwill's obligations as its own. Thus, this factor also supports the conclusion that there was no merger.

Lastly, under *Bielagus* the fact finder may look to other factors indicative of commonality or distinctiveness between the corporations. *Id.* at 641. JGMCJ contends that because the officers and employees of CLASS and Goodwill thought that the companies had merged, and because Goodwill required money from CLASS to continue its operations, there are elements of commonality between them. We have already concluded that the evidence demonstrates that any funds transferred between Goodwill and CLASS were transferred under the terms of the Service Agreement. Further, while the subjective beliefs of some of the officers and directors may, arguably, demonstrate commonality, all other evidence relating to this transaction shows that the companies maintained distinct corporate identities.

■ The Memorandum of Understanding states that it is only a preliminary document meant to summarize the terms of a prospective merger and is not to be read as binding upon Goodwill and CLASS. The only financial interactions between them were pursuant to the Service Agreement and the documented loans the Service Agreement authorized. Moreover, the Service Agreement specifically states that the duties assumed by CLASS pursuant to its terms are not to be construed as a commitment to merge. Goodwill and CLASS did not commingle funds. No assets changed hands, neither company ceased operations or liquidated, and CLASS did not assume Goodwill's business obligations. We agree with the trial court that until Goodwill and CLASS submitted articles of merger, which they did not do, they were two separate companies operating under a proposal to merge. For these reasons, we conclude that the trial court did not err in determining, as a matter of law, that Goodwill and CLASS did not complete a *de facto* merger.

Because the remaining issues raised by JGMCJ all relate to alleged misrepresentations by agents and officers of CLASS, we address them together. We note first that JGMCJ contends that in light of the trial court's finding that agents of CLASS may have knowingly misrepresented the status of the merger, the lease ought to be enforced against CLASS. JGMCJ did not, however, raise any claims of fraud or intentional misrepresentation in the trial court. Instead, JGMCJ's claims alleged negligent misrepresentations only. Therefore, we address JGMCJ's claims as they were presented to the trial court; *i.e.*, as claims based upon negligent misrepresentations, not knowing misrepresentations as JGMCJ contends on appeal.

■ JGMCJ argues that because the trial court determined that prior to signing the lease Harris and Siegel may have misrepresented to Sullivan that the companies had merged, the lease ought to be enforced against

CLASS without regard to the Statute of Frauds. The Statute of Frauds provides: "No action shall be maintained upon a contract for the sale of land unless the agreement upon which it is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person authorized by him in writing." RSA 506:1 (1997). Moreover, no action may be brought to charge any person upon a special promise to answer for the debt, default or miscarriage of another, unless the promise is in writing and signed by the person to be charged. RSA 506:2 (1997). An agreement to lease land for a term of years is a contract to convey an interest in land within the Statute of Frauds. *Byblos Corp. v. Salem Farm Realty Trust*, 141 N.H. 726, 729 (1997).

Here, the lease states that it is a contract between JGMCJ and Goodwill and is signed by Sullivan on behalf of JGMCJ and Harris on behalf of Goodwill. The lease does not mention CLASS, its officers or its agents. Nor does it contain a third-party guaranty provision or state that any entity other than Goodwill is responsible under the lease. Thus, the Statute of Frauds bars JGMCJ from enforcing the lease against CLASS.

As noted, however, JGMCJ contends that the lease still ought to be enforced against CLASS because: (1) the doctrine of equitable estoppel applies; and (2) CLASS' agents negligently misrepresented the status of the merger to induce Sullivan to sign the lease.

Equitable estoppel serves to forbid one to speak against his own act, representations or commitments communicated to another who reasonably relies upon them to his injury. *Cohoon v. IDM Software*, 153 N.H. 1, 9 (2005). The party asserting estoppel must prove: (1) a knowingly false representation or concealment of material facts; (2) a recipient who was intentionally, or through culpable neglect, induced to rely upon the false representation or concealment, ignorant of the truth; and (3) a resultant injury. *Id.* Reliance is unreasonable when the party bringing the estoppel claim, at the time of his or her reliance or at the time of the representation or concealment, knew or should have known that the conduct or representation was either improper, materially incorrect or misleading. *The Cadle Co. v. Bourgeois*, 149 N.H. 410, 418 (2003). Incorporated into the concept of reasonable reliance is the requirement that the moving party exercise due diligence to learn the truth of a matter relied upon. *Id.*

The trial court determined that equitable estoppel did not apply because JGMCJ did not exercise due diligence, and, therefore, could not demonstrate reasonable reliance. We agree. Sullivan, the president and sole shareholder of JGMCJ, despite his extensive business experience,

took no steps to verify whether the merger between CLASS and Goodwill occurred. He had requested combined financial statements of the two companies, but executed the lease before receiving or reviewing them. He had requested and reviewed a Dunn & Bradstreet report on Goodwill, generated near the time the lease was executed, that did not mention that Goodwill had merged. In spite of this clear indication that Goodwill had not merged, Sullivan did not verify the status of the merger with the Massachusetts Secretary of State or undertake any other steps to discover whether the merger had been consummated. Sullivan relied solely upon the unverified statements of Siegel and Harris that the merger had occurred. In such a case, with a businessman as sophisticated as Sullivan, we cannot say that the trial court erred in determining, as a matter of law, that JGMCJ did not exercise due diligence and that its reliance was therefore not reasonable. Because JGMCJ's reliance was not reasonable, the doctrine of equitable estoppel does not bar the application of the Statute of Frauds.

JGMCJ argues that it is improper to impose upon it a duty to investigate the veracity of the representations in order to justify its reliance. As stated above, however, reliance is unreasonable when the party asserting the estoppel claim, knew or should have known that the conduct or representation was either improper, materially incorrect or misleading, or when the party did not exercise due diligence to support its claim of reasonable reliance. *Bourgeois*, 149 N.H. at 418. Because reasonable reliance requires the relying party to undertake due diligence to verify the truth of the matter relied upon, we find no error in the trial court's ruling that JGMCJ had a duty to investigate the truth of the statements made by the representatives of CLASS.

Secondly, JGMCJ contends that Harris and Siegel represented to Sullivan that the merger had occurred, and in so doing, induced Sullivan to sign the lease on behalf of JGMCJ. Relying upon *Maxwell Ice Co. v. Company*, 80 N.H. 236 (1921), JGMCJ contends that because Harris and Siegel volunteered this information with the intent that JGMCJ and Sullivan rely and act upon it, they ought to have exercised reasonable care to verify the truth of that information. Because they did not do so, JGMCJ argues that it should be permitted to pursue its negligent misrepresentation claims without regard to the Statute of Frauds.

In *Maxwell Ice*, we stated: "It is the duty of one who volunteers information to another not having equal knowledge, with the intention that he will act upon it, to exercise reasonable care to verify the truth of his statements before making them." *Id.* at 238. Further, "a person who acts upon a false representation made for the purpose of inducing him to change his position may recover the damages he sustains in an action of

negligence when the maker of the statement ought to have known it to be false." *Id.* at 238-39; *see also Van Der Stok v. Van Voorhees,* 151 N.H. 679, 681-82 (2005).

In *Daley v. Blood,* 121 N.H. 256 (1981), however, we determined that the Statute of Frauds bars an action based upon a defendant's negligent misrepresentation of its intention to sell or lease real estate when the agreement to sell or lease is not reduced to writing. Under *Daley,* "an action based upon the intentional tort of deceit could be maintained even though the promise that was alleged to have been breached was itself unenforceable due to the Statute of Frauds." *Id.* at 257. The reason for this holding is that to bar such an action would not further the policy of the statute but on the contrary would foster an injustice. *Id.* The same policy considerations do not apply, however, when the action brought is based upon an unintentional, rather than intentional, act. *Id.* "Certainly, to bar recovery in contract but to allow it generally in negligence would subvert the policy of the Statute of Frauds and open the door to the evils the statute is designed to avoid." *Id.* "If we were to allow [a] negligence action to be maintained in the face of the Statute of Frauds, the practical effect would be to render that statute almost meaningless." *Id.* at 257-58.

Here, as we have noted, JGMCJ has brought only claims of negligent misrepresentations. Further, JGMCJ did not have a written contract with CLASS for the lease of land. JGMCJ's lease was with Goodwill and did not mention CLASS, and CLASS is not liable on the lease as the successor to Goodwill. Therefore, despite JGMCJ's reliance upon the general principles of recovery for negligent misrepresentations in *Maxwell Ice, Daley* bars its negligent misrepresentation claims in the face of the Statute of Frauds. JGMCJ contends that the policy considerations in *Daley* do not apply here, and thus *Daley* does not bar its negligent misrepresentation claims. We, however, do not see any meaningful distinction between *Daley* and this case. Therefore, we uphold the trial court's grant of summary judgment on JGMCJ's negligent misrepresentation claims against CLASS and its board.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.